## Ex Parte Rodriguez.

1. A person voting twice on the one day fixed by Section 12 of the election act of March 31, 1873, is not subject to the penalty fixed by Section 31 of the same act.
2. An election must be legal and valid to subject a party to the penalty of the statute against illegal voting.
3. In a proceeding on *habeas corpus* the constitutionality of a statute may be determined under which a general election was held.
4. Section 12 of the election act of March 31, 1873, declared to be in violation of Section 6 of Article 3 of the State Constitution.
5. In a proceeding on *habeas corpus* the constitutionality of the law under which the applicant stands charged cannot be drawn in question until such facts are shown as would justify the court in holding over for trial the accused in the event the law should be declared constitutional.
6. See this case for facts regarding an offense charged upon which a statute was pronounced in a proceeding on *habeas corpus* unconstitutional.

SECTION 6 of Article 3 of the State Constitution is as follows:

"Sec. 6. All elections for State, district and county officers shall be held at the county seats of the several

45

counties, until otherwise provided by law ; and the polls shall be opened for four days, from 8 o'clock A. M. until 4 o'clock P. M. of each day."

The 4th Section of 3d Article of the Constitution is as follows: "The members of the House of Representatives shall be chosen by the qualified electors, and their term of office shall be two years from the day of general election ; and the sessions of the Legislature shall be annual, at such times as shall be prescribed by law."

The 2d Section of the 4th Article of the Constitution provides: "The Governor shall be elected by the qualified voters of the State, at the time and places at which they shall vote for Representatives to the Legislature."

The 1st Section of an act entitled, "An act regulating elections," approved by E. J. Davis, Governor, March 31, 1873, provides that each justice's precinct shall constitute an election precinct, and that these may be subdivided into as many election precincts as the justices of the peace of the counties may deem expedient.

The 12th Section of the same act is as follows: "That all the elections in the State shall be held for *one day* only at each election, and the polls shall be open on that day from 8 o'clock A. M. to 6 o'clock P. M."

The act of May 26, 1873, which was approved by Edmund J. Davis, Governor, provided for a general election on Tuesday, December 2, 1873, for the election of members of the House of Representatives, Governor, Lieutenant-Governor, Treasurer, Comptroller of Public Accounts, Commissioner of the General Land Office, a Superintendent of Public Instruction, thirty Senators, and the various county officers throughout the State.

In pursuance of a joint resolution of the Legislature, of June 4, 1873, and the Governor's proclamation, the polls were opened at the same general election at the various election precincts throughout the State to receive votes

on proposed changes in the State Constitution, among which was one increasing the number of judges of the Supreme Court, and changing the tenure of their office.[1]

The proclamation of Governor Davis, under which the general election of December 2, 1873, was held, required the election to be conducted in accordance with the provisions of the election law of March 31, 1873.

Section 33 of Article 3 of the Constitution is as follows: "Elections for Senators and Representatives shall be general throughout the State, and shall be regulated by law."

On the sixteenth day of December, 1873, one Joseph Rodriguez applied to Wesley Ogden, P. J., for a writ of *habeas corpus*. He alleged in his petition that he was illegally restrained of his liberty in Travis county by one John Price, a deputy sheriff for the county of Harris. The writ was at once issued. On the next day Price produced the body of Rodriguez in court, and in his return to the writ admitted: 1. The arrest and detention of Rodriguez. 2. Alleged that he, acting as deputy under one A. B. Hall, sheriff of Harris county, had arrested Rodriguez and detained him by virtue of a warrant issued by John W. McDonald, a justice of the peace of beat No. 1, in Harris county, which he attached to his return.

The warrant bore date December 13, 1872; it was an order to any sheriff or constable in Texas to arrest Rodriguez, and began with the following circumstantial preamble, viz.:

"Whereas, complaint has been made under oath before me that in the county of Harris and State of Texas,

---

[1] The amendment proposed was adopted by the people, who, at the same election, elected Richard Coke Governor; he appointed a new Supreme Court, retaining none of the judges who sat in this case.

on the second day of December, 1873, at an election then and there, on said second day of December, 1873, *began, held and concluded*, the same being then and there an election for State, district and county officers, under the provisions of an act of the Thirteenth Legislature of the State of Texas, entitled 'An act regulating elections,' approved March 31, 1873, one Joseph Rodriguez, who resides in the county of Travis and State of Texas, did, in the county of Harris and State of Texas, on said second day of December, 1873, willfully, fraudulently and feloniously, at Houston, in said county of Harris and State of Texas, vote at said election for State, district and county officers more than once at the same election, contrary to law," etc.

*Frank M. Spencer*, district attorney for Harris county, was appointed in the absence of the Attorney-General to represent the State.

Geo. F. Moore, Esq., announced to the court that the Austin bar had at a meeting requested by resolution M. A. Long, C. S. West, Thos. E. Sneed, W. M. Walton, A. W. Terrell and himself to apply to this court for permission to assist in representing the interest of the State of Texas in this proceeding.[1]  The consent of the court was given.

Counsel for the State filed the following motion and affidavit:

"EX PARTE RODRIGUEZ. ⎱
    "*Habeas Corpus.*    ⎰

"The undersigned, being by the court permitted to represent the State in this proceeding, in behalf of the State

---

[1] Judge Moore was unavoidably absent during the subsequent proceedings.

say, that the court has no jurisdiction to try this case, and that said want of jurisdiction consists in this, viz.: They are informed and believe, and so charge the fact to be, that this is a fictitious case, or is essentially of that nature ; that it is a case originally instituted, and is now being prosecuted, not in the interest of the prisoner in fact, but in behalf of certain other persons, to extort from this court an opinion as to the constitutionality of the 12th Section of an act of the Legislature of the State of Texas, entitled 'An act regulating elections,' approved the thirty-first day of March, 1873.

"In part support of this motion they attach and here tender the affidavit of George Goldthwaite, Esq., of Harris county, Texas, and pray that the facts may be diligently inquired into, to the end that a fraud may not be practiced on the court, the law violated, and the course of justice diverted to the accomplishment of individual purposes, illegitimate in character, and which, known, cannot be recognized or aided by courts of law or justice.

"And they further say, that they are further informed and believe that there is no case pending in Harris county, Texas, against the said Rodriguez. That no complaint has ever been made against him, and that no warrant has ever been legally issued against him, and that he has never been legally arrested, and is not now legally held; and they pray as before.

"Spencer, District Attorney,<br>"Committee of the Bar."

"The State of Texas, } *Ex Parte* Jose Rodriguez.
"*County of Harris.* }

"Geo. Goldthwaite, a citizen of Harris county and State of Texas, being duly sworn, under oath deposes and says :

"That deponent verily believes, and so believing charges

the fact to be, that this case, *Ex Parte* Rodriguez on *habeas corpus*, is a fictitious case made by A. B. Hall, late sheriff of Harris county.

"That his belief is founded upon these facts: That several days prior to the arrest of the said Rodriguez this deponent was informed that said A. B. Hall had employed the Hon. A. J. Hamilton to attend to the criminal cases then about to be brought with a view to testing the constitutionality of the election law and the legality of the late election.

"That this deponent has been informed by one Geronimo Perez that for a month or six weeks last past the said Rodriguez has been, to the knowledge of him, said Perez, in the employ of said A. B. Hall, he, the said Hall, paying the said Geronimo the sum of one hundred dollars per month.

"That the said John Price, the officer making the arrest, is known to this deponent to be in the employ of said A. B. Hall, being the late deputy sheriff of said A. B. Hall.

"That said A. B. Hall is a defeated candidate for the office of sheriff of Harris county; and deponent is informed and verily believes that said Hall is paying all expenses incident to the conducting of this suit.

"That deponent has been informed by other parties that the said Geronimo Perez has made the same statements to other parties resident of Harris county, viz., to G. W. Gregor and E. P. Claudon.

"That deponent is further informed that said A. B. Hall paid the witness, John W. McDonald, the money to pay his expenses on this his visit to Austin as a witness, and that this money for that purpose was paid him, said McDonald, in the presence of R. O. Love, of Harris county, on the eve of his departure for Austin.

"GEO. GOLDTHWAITE."

" Sworn to and subscribed before me this twenty-second day of December, A. D. 1873.

"W. P. De Normandie."

*Spencer*, for the State, in support of the motion to inquire into the alleged fraud upon the jurisdiction of the court, stated that, as the district attorney for the county in which the offense was alleged to have been committed, he had, in connection with the grand jury, carefully examined the charge; that no indictment had been returned; that he was convinced the process of law had been prostituted, in making the arrest, to the accomplishment of individual purposes, and this with the consent of the relator, whose arrest he believed to be simulated and not real. He concluded by urging the court for permission to expose the fraud, and time to procure witnesses; and if this were not allowed, he asked, as the law officer for the State, appointed for the purposes of the trial by this court, that Rodriguez should be discharged.

*A. J. Hamilton*, for relator, objected to delaying the cause, and contended that the motion was insufficient to accomplish the purpose desired.

*M. A. Long* said, in substance, that he had not before felt called upon to add anything to the arguments of his colleague in this case, but in the present posture of this most important investigation he craved the indulgence of the court to give utterance to a few suggestions. The honor of the State, the honor and fair fame of the judicial department of her government, the honor and reputation of this tribunal of final resort, and the honor and reputation of the present incumbents of the bench of this august tribunal, not only for ability and legal learning but for purity, impartiality and fairness, seem to be more or less involved in the decision of this motion. As a citi-

en of Texas—for which he trusted he felt only a becoming glow of patriotic affection,—as one of the oldest members of this bar—a bar not undistinguished for learning, faithfulness, and fearless discharge of duty as earnest and candid counselors of this honorable court—and entertaining, as he did, confidence in the integrity of each member of this court, and a very warm personal regard, he felt constrained in the most solemn manner to warn this court against too hasty action upon the question now under consideration.

The singular aspect of this case as it now stands before the court and the country demands the most searching examination and scrutiny. This court cannot doubt that himself and colleagues do really believe that this is a fictitious case, gotten up in the most artful manner to entrap this court into a decision of, a mere political question, and that for mere party purposes; nor can this court doubt that the counsel at least are perfectly confident of being able to produce full and overwhelming evidence of this most material fact, if the time asked for is granted to enable them to bring the witnesses from the city of Houston. Indeed, when the singular manner in which this case has been brought before this court, and all the other suspicious circumstances already disclosed, are carefully considered, this court is not only justified in believing counsel sincere in their conviction of being able to obtain the proof, but also to arouse in the mind of the court very strong suspicions (if not conviction) that an attempt is being made to impose upon its legitimate jurisdiction by aiming to extort from this court a political dictum, for party purposes, upon a fictitious case—a gross contempt of any court, demanding prompt punishment. Can this court afford to wink at this contempt, as if impatient to jump to a dictum upon party politics? Such a ruling could only be regarded as a dictum, and in no

sense binding upon the other departments of the government. We are persuaded that this honorable court will not suffer itself to be so imposed upon for such a purpose.

If this delay, for the purpose of obtaining existing proof, is refused under the circumstances now fully disclosed, he feared the honor of this grave tribunal will suffer in public estimation, at home and abroad. It can hardly be otherwise. To aid in averting this result, this great public calamity, is the only motive which prompts these suggestions.

Even if this court possessed the constitutional power to decide the question here sought to be presented—which upon reason and authority, as will be shown by my colleagues at the proper time, it has not—such power could only legally be exercised in the determination of a real, and not a fictitious case. To attempt its exercise in a fictitious case would plainly amount to an attempt to usurp a power not conferred by the Constitution upon this court, which would as plainly amount to a high crime worthy of impeachment. If it is said in opposition to this suggestion, that upon the trial of an impeachment it would be very difficult, if not impossible, to prove that this court knew the case to be fictitious, and therefore did not willfully and corruptly attempt to usurp a power not granted in the Constitution, still it is to be considered whether a refusal to hear proof upon the very point in question would not amount to that kind of willful ignorance which neither law nor reason will tolerate. Willful ignorance is, in all judicial tribunals, regarded as equivalent to guilty knowledge—no better, indeed, than a fraudulent and corrupt evasion or subterfuge—an aggravation rather than a mitigation of guilt. Surely this plain and obvious view of the subject has not occurred to the minds of the distinguished counsel on the other side

(ex-Governor Hamilton and ex-Judge Sabin), who so zealously urge this court to shut its eyes to the facts of the case, and refuse to be informed by evidence. But this court must judge which is the wisest and most friendly counsel given on this point.

The distinguished and learned counsel for the relator certainly occupy a most singular position in this case, and present a most remarkable spectacle, such as was seldom ever presented in a court of justice.

As faithful counselors and friends of this court, we contend, and offer to prove, that the relator did not vote twice at said election, and that this is, and was from the beginning, known to the relator and his distinguished and learned counsel. We can prove all this and more, if time be given for the purpose. We do not wonder, therefore, that counsel object to the exposure of their conduct in this respect, because it plainly involves them in the guilt of a most deliberate contempt of this court, which we feel confident they would be unable to purge upon their corporeal oaths. But should the honorable court wink at this contempt, and refuse to allow the most full and complete proof thereof, then, indeed, we shall be astonished, as will the public. It being conceded, as it is, that this court has no jurisdiction or legal right to hear and determine a fictitious case, we submit that counsel, by opposing the introduction of full proof of this fact, thereby fully admit the fictitious character of this case. All the world will see the motive for bringing this case away from Houston, and here springing it before this court, without allowing time to expose the gross fraud which is attempted against the jurisdiction of this court.

We hope this court will also be able to see it as plainly as the public must, and maintain its fair fame by promptly dismissing the case and taking such course as to the attempted contempt as its character and dignity

may demand. I speak for myself, and, I believe, for my colleagues (said Mr. Long), and I feel it to be my duty to this court earnestly to protest against this attempt to bring down the judicial ermine to the level of trick and device, to stain it in the cesspool of fraud and party politics. For the honor of this court and the State I speak.[1]

McADOO, J.—The motion and affidavit upon which the motion is based to dismiss this cause on the ground that this court has no jurisdiction, because this case is fictitious, or in that nature, have been maturely considered, and we find nothing to warrant such dismissal.

The affidavit admits that the applicant for the writ of *habeas corpus* is a real person; that the person making the arrest was the deputy sheriff of Harris county, where the writ of arrest issued, and does not deny that the writ of arrest did issue, nor that the written complaint was made under oath before the presiding justice of Harris county, upon which the writ of arrest issued, nor that the applicant, now before the court, is the person Rodriguez who applies for the writ; nor does the affidavit deny that the applicant voted twice at the late election, the offense of which he stands charged.

Unquestionably, and on the authority of this court (3 Texas, 360, Smith v. Brown) and the courts of England, a merely fictitious case, either civil or criminal, instituted merely to extort an opinion of a court, will not be entertained by the courts. Such cases are not only not within the jurisidiction, but are in contempt of any court in which such case may be presented. This jurisdictional question

---

[1] The above remarks of Mr. Long were not reduced to writing at the time and filed as a brief, but upon request that gentleman has furnished the foregoing substance of his remarks, from memory, and from stenographic notes made at the time for the public press.—REPORTERS.

goes to the inquiry, Is the action a real one, founded on a real issue, in good faith; or is it a mere fiction or wager, with no *bona fide* cause of action, intended merely to obtain the decision of the conrt?

In the former case the court has nothing to do with the motives of the parties to the action, so far as jurisdiction is concerned; and, in the latter case, the court will take no jurisdiction, however important the legal questions involved. If there be a *real case*, the court will entertain it; if it be a *fictitious case*, the court will treat it as a fraud upon its jurisdiction, and will not entertain it. In the former case the court will inquire into and adjudicate; in the latter it will, at least, dismiss the case.

Tested by these rules, in view of the facts set out in the affidavit on which the motion is based, and the other facts before the court in the person of the applicant and the return of the officer making the arrest, the motion cannot be entertained at this stage of the proceedings.

The applicant has been arrested on a grave charge—no less than felony. His arrest seems to have been regular and legal. He is before us in obedience to the writ of *habeas corpus*, and our duty is plainly pointed out by law. The language of the law is plain and explicit. Article 2624, Paschal's Digest, reads as follows:

"The judge or court before whom a person is brought by writ of *habeas corpus*, shall examine the writ and the papers attached to it, and if no legal cause be shown for the imprisonment or restraint, or if it appear that the imprisonment or restraint, though at first legal, cannot, for any cause, be lawfully prolonged, the applicant shall be discharged."

The above section is mandatory upon the court. In justice to the prisoner, who is charged with crime, on the one hand, and the State, whose laws are charged to have been violated, on the other, the court is bound to inquire

into the facts, and act accordingly—to discharge, bind over, or commit.

MOTION OVERRULED.

*Spencer, District Attorney.*—May it please your honors, the decision which has just been made renders it impossible for me in justice to my own sense of duty to longer represent the State in this proceeding. Acting under what I believed my duty as one of the law officers of the State, appointed by your honors to represent her interest, I filed a motion suggesting a fraud on the jurisdiction of this court, and asking for time to procure witnesses from Houston to establish it. It was sustained by the affidavit of an honorable attorney of this court. No time has been allowed to procure those witnesses, no evidence has been heard, and by the opinion just delivered your honors, in advance of a hearing, have determined in favor of your jurisdiction.

I assured your honors that as the district attorney for Harris county, where the offense is charged to have been committed, I had carefully examined the charge in connection with the grand jury; that they had refused to return a bill; that I was convinced that Rodriguez had not committed the act charged against him; that his arrest was simulated and not real; that this case was brought here, not to release a real prisoner detained against his will, but to procure a decision on the constitutionality of the late election. Believing all this, I respectfully asked to have the prisoner discharged, if time could be allowed to establish the fraud upon the jurisdiction. This, also, has been refused. I cannot longer represent the State under the circumstances, and now respectfully announce my withdrawal from the cause.

The court then appointed B. Trigg, Esq., district attorney for the Travis district, to represent the State in con-

nection with the bar committee. The following motion was then filed by counsel for Rodriguez:

"IN SUPREME COURT.

THE STATE OF TEXAS,
EX REL. JOSE RODRIGUEZ    }    *Habeas Corpus.*
      v.
JOHN PRICE.

"And now comes the relator, Jose Rodriguez, and moves the court to discharge him from custody, upon the ground that the return to the writ of *habeas corpus* herein shows no just or legal cause for his further detention.

                "A. J. HAMILTON,
                "C. B. SABIN,
                      "For relator."

It was moved by counsel for the State to strike out and hold for naught the foregoing motion, for the following causes:

"1. Because there is on file in this case a suggestion in the nature of a plea that this case is fictitious, or essentially of that nature, and that the court has no jurisdiction to try and determine issues joined in a fictitious case, or one essentially of that nature.

"2. Because another court has taken jurisdiction of the subject matter involved in this case and the person of the prisoner, if the case be real and not fictitious.

"3. Because it is not competent for this court, in the due administration of the law, to take jurisdiction of a great constitutional question on the trial of a writ of *habeas corpus.*

"4. Because this court will not take cognizance of a question involving the constitutionality of a law, unless the same becomes directly, necessarily and imperatively involved.

"5. Because, on inspection of the papers, a *prima facie* case is shown, so far as charging a crime against the laws of the State is concerned, and the prisoner should be remitted to the court first obtaining jurisdiction of the subject matter and the person of the prisoner.

"6. Because the question involved is a political question, being no less than an involvement of the political organization of the State of Texas, and cannot be passed on by the judiciary.

"7. Because it is apparent from the face of the papers, if the proceedings be real and in good faith, that the object of the applicant is to obtain his release from custody; while it is manifest, from the confession of the party, through his counsel, in open court, that the true and real object of this proceeding is not to release the prisoner, but to extort an opinion from the court on a question that is not necessarily involved, and at most only arises collaterally.

"8. Because it is sought in this proceeding, and by the motion moved against, to make the writ of *habeas corpus* work the office of a writ of *quo warranto*.

"9. Because, if the writ of *habeas corpus* could, under any circumstances or state of facts, take the place and work the office of the writ of *quo warranto*, such office cannot be worked in this case, for the reason that contending parties for office are not, directly or by any fair or legitimate intendment, before this court, either in person or in right.

"Therefore the State prays that said motion be stricken out and held for naught, and that the prisoner be remanded to the custody of the officer holding him, for further proceedings before the magistrate's court in Harris county, which has jurisdiction attached of the person and the subject matter.

> "B. TRIGG, District Attorney,
> "COMMITTEE OF THE BAR."

McAdoo, J.—Article 2626, Paschal's Digest, reads as follows: "In all cases where no indictment has been found it shall not be deemed that any presumption of guilt has arisen from the mere fact that a criminal accusation has been made before a competent authority."

This section gives the applicant for the writ of *habeas corpus* every presumption of innocence, until proof be introduced tending to show his guilt, on a trial on *habeas corpus*, just as he is entitled to that presumption on a final trial before a jury. This presumption lies only on *habeas corpus* trials in cases in which no indictment has been found. After indictment found, the rule is changed. In the latter case the indictment is to be treated as a verity, and the *onus* is on the applicant to show such facts as entitle him to enlargement.

A complaint before a competent authority, in proper form, is ample authority for issuing a writ of arrest, and for the arrest and holding of the accused until his cause can be inquired into by a competent authority. This inquiry may be made in two ways: 1. By a magistrate sitting as a committing court; in which case, though properly charged, the presumptions of innocence arise in his favor; and the complaint, though under sanction of an oath, can in no manner, on such trial, be invoked as raising any presumption whatever of guilt. Such complaint cannot even be read in evidence; and if no proof of the *fact* of guilt were produced, the accused would necessarily be discharged.

2. The accused, while in arrest, may sue out a writ of *habeas corpus*, and have the cause inquired into before a judge or court; in which case the same rules of presumption arise, and the same general method must be pursued as in trials before a committing court. The object is to be held in view, to determine the question whether the accused shall be held for trial, or shall be discharged. If

the facts showing his guilt be established, then he will be held to answer on a trial, or to await the action of a grand jury. If no facts appear showing his probable guilt, by competent testimony, he must be discharged.

Until *a case* be brought before the court, it seems to me to be not proper, or within the jurisdiction of the court, to enter upon an adjudication of the constitutional or binding force of a law under which the party stands charged.

A decision of such question, in my view, would be *coram non judice.*

It seems to be only necessary to apply the rules above set forth to a given case to render the conclusion arrived at clear and certain. It is true, in case the court should enter upon the legal question, in the absence of proof of the violation of the law in question, and determine that the law was unconstitutional, the accused of course would be discharged. But should the court arrive at a different conclusion—that the law was constitutional and in full force—what then would the court be constrained to do? The law is in full force, but there is no proof of its violation. There is no evidence before the court of the violation of the law by the accused, and no presumption of his guilt can arise from the fact that he is accused before a court of competent authority. The plain duty of the court would be simply to discharge the accused, although the decision of the court were against the accused on the only issue raised in the case. If the judgment of the court is not to be affected in any manner by the decision of the issue, it is simply not an issue at all, and such a decision would be of no force or authority whatever.

The true rule by which to determine whether a question is *coram judice* or *coram non judice,* is this: If the judgment of the court would be affected by the decision, one way or the other, according to the decision, then the

question is *coram judice*, and ought to be decided ; and such a decision of the highest court of the State becomes authoritative.

If the judgment in the case would not be affected by a decision—if the judgment would be the same, no matter how the question involved might be decided—then such question becomes no proper issue at all, is *coram non judice*, and such a decision would be of no authority whatever.

It is my opinion, therefore, that the constitutionality or unconstitutionality of the law under which the applicant stands charged cannot be drawn in question in this case until such facts are shown as would justify the court in holding over for trial the accused in the event the law be held constitutional and valid.   In this opinion Mr. Justice Walker concurs.

MOTION OF RELATOR OVERRULED.

OGDEN, P. J., announced that the counsel for respondent would proceed with the evidence.

*Trigg, District Attorney*, called as a witness McDonald, chief justice of Harris county, for the purpose of proving that the case was fictitious, who testified that he filled out a blank affidavit and issued the warrant for the arrest of relator ; did not know who prepared the affidavit ; had written "Antone Rodriguez" in the process by mistake, and afterwards substituted "Joseph ;" paid his own expenses to Austin ; received money from Sheriff Hall, but it was on account of money due him from the county ; thought A. K. Taylor wrote the affidavit ; that he (witness) had been out of his office, and on returning *found* the affidavit on his desk under a paper weight ; that he knew nothing of the matter charged against the relator.

This witness voluntarily informed the court, while on the stand, that there were others in the court room who could prove the truth of the charge against Rodriguez. These persons were unknown to the district attorney or his associate counsel. On their names being given, the district attorney, after consulting with the committee, declined to examine them.

McADOO, J., remarked that the case was a curious one—the State seemingly being desirous not to prove the relator guilty of the charge, while the friends of relator furnished witnesses who, they say, will prove his guilt, but that the court would not be trifled with. After a short consultation among the judges, Ogden, P. J., ordered the district attorney to call the witnesses whose names had been given and to examine them.

The witnesses named were Charles Wilson, a citizen of African descent, Wm. House and John Limas, both Mexicans.

*Charles Wilson* testified that Rodriguez voted in the second ward at Houston at the election held on the second of December, 1873; witness voted twenty-nine Mexicans, who were taken by him from Austin to Houston for the purpose of voting in Houston; saw Rodriguez vote in the fourth ward in Houston; had a certificate, which he handed, together with his ballot, to the man at the ballot box; was hired to come to Austin for voters by a Mexican named Geronimo.

*Wm. House* lived in Austin; voted at the election in Houston once; saw Rodriguez vote at late election at Houston twice; witness was told by Geronimo to come here and testify.

*John Limas* lived in Austin; voted at the late election in Houston once; saw Rodriguez vote twice at that election.

The State then introduced—

*W. H. Gavin,* who testified that he was at the late election in Harris county; had remarked to Judge Mc-Donald some days after the election that relator had voted twice; had been so informed; on looking over the registration books, found that Rodriguez had a certificate of registration from the second ward, and that he had voted in that ward; thought the polling list would show if he voted in any other than the second ward; made the complaint on Friday or Saturday after election; they wanted to get up a case on affidavit; no one suggested Rodriguez; selected him on information; would swear that Rodriguez was not a deputy of Sheriff Hall; might be employed by him in some other capacity; the certificate was issued in name of Joseph Rodriguez.

*Justice McGowan,* of Houston, produced the polling lists of that city, which were placed in evidence by the State; that by direction of the grand jury of Harris county he had examined the lists, and found the name of Rodriguez recorded as a voter but once at the late election.

De Normandie, the clerk, was then ordered by the court to examine said poll lists.

*W. P. Hall,* sworn as a witness for the State, was asked if he had written the petition for a writ of *habeas corpus;* and if so, when and where he had done so. He claimed that his privilege as an attorney protected him, and refused to answer. The State's counsel asked that he be compelled to answer or committed for contempt. The court ruled that the witness was privileged from answering.

*Judge Sabin* testified that before proceedings against Rodriguez he was in Houston on business in the Federal

court; heard the illegal voting of Rodriguez discussed. He then remarked there was a way of testing the constitutionality of the election law by writ of *habeas corpus*, which would bring it directly before the Supreme Court; but he wanted to be paid for his advice; went home to Galveston, and A. J. Hamilton writing to Houston for assistance, he was asked to come up and assist, and did so.

*Question by State.* Who pays your fee, Judge Sabin?

*Answer.* I will answer if the court so directs.

The court decided that the answer was a privileged one.

*W. P. De Normandie,* clerk of this court, had examined the polling lists for Houston for the election held on the second of December, 1873. He found the name of Rodriguez but once; it appeared on the list for the second ward, and was No. 505; was the last but one on the list.

*Judge McGowan* was at the fourth ward during the day of the late election, to prevent illegal voting; was careful and vigilant; did not see Rodriguez vote there.

*Henry Thompson* is deputy sheriff of Harris county; was stationed at the fourth ward to look after Mexican voting; discharged the duty faithfully; did not see Rodriguez vote there.

The court, on the evidence being closed, announced that discussion would be allowed on every question of law and fact involved in the case.

*A. J. Hamilton,* for relator.[1]

---

[1] The arguments made by counsel were taken down by stenographic reporters in attendance. The general interest felt at the time in the case rendered a full report desirable; and we regret none of the counsel, except Messrs. Long and Spencer, have responded to our request to furnish their arguments for insertion. Mr. Hamilton's closing argument is imperfectly reported on this account, and no portion of his opening argument could be obtained.

*B. Trigg, District Attorney*, for the State, in response.

*W. M. Walton*, for the State, argued the following propositions :

1. A suggestion having been filed that this case is fictitious, or essentially of that nature, this court has no jurisdiction to try issues joined in such a case.

2. If the case be real, and not fictitious, then another court has already taken jurisdiction of the subject matter involved, and of the person of the prisoner.

3. It is not competent for this court, in the due administration of the law, to take jurisdiction of a great constitutional question on the trial of a writ of *habeas corpus.*

4. This court will not take cognizance of a question involving the constitutionality of a law unless the same becomes directly, necessarily, and imperatively involved.

5. On an inspection of the papers a *prima facie* case is shown, so far as charging a crime against the laws of the State is concerned, and the prisoner should be remitted to the court first obtaining jurisdiction of the subject matter and of the person of the prisoner.

6. The prisoner should be remanded to the court from which the warrant of arrest issued ; because, while it appears from the face of the papers (if the proceeding be real) that the object of the relator is to obtain his release from custody, it is manifest from the confession of the party, through his attorney, in open court, that the true and real object of this proceeding is not to release the prisoner, but to extort an opinion from this court on a question that is not necessarily involved, and at most only arises collaterally.

7. It is sought by the relator in this proceeding to make the writ of *habeas corpus* work the office of a writ of *quo warranto;* and this cannot be done, because the contending parties for office are not directly, or by any fair

or legitimate intendment, before this court, either in person or by attorney.[1]

*A. W. Terrell*, for the State, referred to the anomalous presentation of the case, showing, on the one hand, a denial by the State that Rodriguez had ever voted twice at the late election, and a persistent admission by the prisoner's counsel that he had, who claim his discharge solely on the ground that the election was illegal; that the State had not been permitted to show that the arrest was not real, but simulated, and a fraud upon the court's jurisdiction; that the law officer for the State first appointed (Mr. Spencer), who had investigated the charge before the grand jury, had withdrawn when refused permission either to investigate the alleged fraud or discharge the prisoner.

It is true, you have facts before you, but how testified to? I will not comment on the testimony of the miserable creatures placed on the stand by order of the court, who testify to their own infamy while attempting to make a case against Rodriguez. Two of them in Houston yesterday—in Austin to-day—accidental bystanders, listening to proceedings conducted in a language which they could not understand! How came they here? Who brought them? They came without process, and I say, in my place, that none of the counsel representing the State knew even of their existence until they were placed on the stand at the suggestion of Justice McDonald and by the order of this court. They were contradicted by the poll book and by Judge McGowan and Thompson. Had our application for time to expose the fraud upon this

---

[1] We are informed by Mr. Walton that he could not procure the report of his argument from the stenographer, and could not therefore furnish it for insertion here. His argument was able, and exhaustive of the points discussed.

court's jurisdiction been allowed, we would have been better prepared to expose both the mysterious appearance of these strange witnesses and their perfidy.

The executive and legislative departments of the State, providing for their succession, enacted and approved the law under which the late general election was held. It is already a part of the history of the times that the people of Texas, in that election, condemned by a majority of over forty thousand the present State administration. Within a few days their Governor and representatives elect will meet here to perform their functions of office. If from any cause they should fail to do so, then Texas would be without a constitutional government, for the official term of the Thirteenth Legislature has expired by express provision of the Constitution; and if the election act which you are now considering be void, it would follow, not only that the State is without a law to elect a Legislature and Governor, but without a Legislature to enact one.

In the face of these facts you are asked to pronounce, on *habeas corpus*, the late election unconstitutional—to cut off official succession in co-ordinate departments, and, so far as your judicial veto can accomplish it, to destroy the State government. It is idle to deny the fact that the whole purpose of the counsel for the relator is, by obtaining a decision in this case favorable to them, to make a platform broad enough and strong enough to sustain the advancing footsteps of another Federal reconstruction. Even the children of Texas know that such is the object of this proceeding.

If you have jurisdiction, under any circumstances, to determine on the constitutionality of a general election which seeks to provide for the succession of co-ordinate departments—which I deny—then the able argument of my associate, Mr. Walton, seems conclusive that you can-

not exercise it in this case; but I place the right of the people to elect their Governor and Legislature upon other and higher ground than the position of a semi-colon in a constitutional clause, and above the judgment or caprice of any tribunal except the representatives chosen by the people.

It seems to me that the adversary, in his efforts to define the jurisdiction of this honorable court, has left nothing for the people except by your sufferance. I submit that the judicial department of this State cannot determine the validity of an election affecting the succession in co-ordinate departments; that power, being conferred by the Constitution on the legislative branch of the government, cannot be exercised by the judiciary without a flagrant usurpation of power destructive to representative government.

The jurisdiction sought to be obtained in this case is foreign to the organization and powers of this court, for it proposes a political and not a judicial inquiry. It proposes to inquire into and determine the manner of the exercise by the people of the right of suffrage, reserved to them to elect their Governor and law-makers, who are clothed with the possession of two other independent and co-ordinate departments of the sovereign government.

The 2d Article of the Constitution, after dividing the powers of government into three distinct departments and confiding each to "a separate body of magistracy," provides that "no person or collection of persons, being of one of these departments, shall exercise any power properly attached to either of the others, except in the instances herein expressly permitted."

Section 15, Article 3, provides, "Each house shall judge of the elections and qualifications of its own members."

The 3d Section of the 4th Article of the Constitution

provides for the ascertainment by the Legislature, in joint session, of who has been elected Governor, and that, after determining this question, "he shall be declared by the speaker, under the direction of the Legislature, *to be* Governor."

Here, then, is judicial power vested in the Legislature to ascertain and determine the legality of their own election, and also that of the Governor. No board of canvassers intervenes, whose action might be made the subject of judicial revision, as in Wisconsin, in the case of Attorney-General v. Barstow; but a department of the government pronounces on its own existence, and proclaims the Governor. Where is your warrant of authority for revising its action? If you have none after its judgment is pronounced, upon what principle of law can you invade its jurisdiction in advance by undertaking to determine the legality of the election at which both it and the chief of the executive department were chosen?

If I am answered that you also must construe the law in determining the rights of a citizen restrained of his liberty, then I say this question is a political one, or one depending on legislative determination, and that in all such cases the courts uniformly adopt, and never antagonize, the construction of the legislative department.

(In support of this position the following authorities were cited and commented on, viz.: 6 Peters, 711; 12 Peters, 520; 13 Peters, 419; Cherokee Nation v. The State of Georgia, 5 Peters, 20; Rhode Island v. Massachusetts, 12 Peters, 736, 737; Barclay v. Russell, 3. Ves., 424; 3 Sumn., 270; Scott v. Jones, 5 How., 374; Williams v. Suffolk Ins. Co., 3 Sumn., 270; Luther v. Borden, 7 Howard, 9; Cooley's Constitutional Law.)

But in further support of my position, that the courts in considering a political question will never antagonize but always adopt the pronounced will of the legislative

department, will be found the opinion of Chief Justice
Marshall, delivered in 1829, in Foster & Elam v. Neilson,
2 Peters, 308.   In that case the Supreme Court of the
United States refused, upon the application of a citizen
in a suit for land, to give a construction to the treaty of
Ildefonso upon its own judgment, upon the ground that
the question involved was a political one, and adopted
without questioning the legislative construction.   Chief
Justice Marshall says: "If these departments, which are
intrusted with the foreign intercourse of the nation, which
assert and maintain its interest against foreign powers,
have unequivocally asserted its rights of dominion over a
country of which it is in possession, and which it claims
under a treaty—if the Legislature has acted on the con-
struction thus asserted, *it is not in its own courts that
this construction is to be denied.*"   And again, he says
the question is "more a political than a legal question,
and in its discussion the courts of the country must re-
spect the pronounced will of the Legislature."

The true distinction between a question political in its
character and one originally cognizable before the courts
I take to be this: that wherever, by the terms of the Con-
stitution, judicial power is confided to the executive or
legislative departments, every question which can arise
regarding its exercise is a political one; all other ques-
tions involving the determination of rights claimed are
for the judiciary.

Courts as well as Legislatures derive their origin from
the Constitution, and if that instrument be superior to an
act of the Legislature, it also limits and prescribes the
powers of the courts.   If by the terms of the Constitu-
tion the election of the people's representatives and their
Governor is to be judicially ascertained and announced
by another department, and not by you, then you have
no more right to entertain original jurisdiction of that

question than had the money changers and those who sold doves to ply their vocation in the temple. Any other construction of your powers would violate the genius of our government and inflict a fatal stab on the freedom of the people.

Chief Justice Taney, in Luther v. Borden, approved—as has been since done by every other court in the Union—the doctrine of Martin v. Mott, "That whenever a statute gives a discretionary power to any person, to be exercised by him in his own opinion of certain facts, it is a sound rule of construction that the statute constitutes him the sole and *exclusive* judge of the existence of those facts."

The Legislature is constituted by the very letter of the Constitution the exclusive judges of their election; and it is no answer to their claim to exclusive power over the question to say that they have not yet assembled, and this court may therefore exercise jurisdiction and decide on the legality of the election at which they were chosen.

The Supreme Court of the United States, in Rhode Island v. Massachusetts, 12 Peters, 736, 738, decided that "A question *per se* political must be adjusted by the political department of the government, unless agreed to be settled as a judicial question, and in the Constitution so provided for." The same doctrine was announced in Garcia v. Lee, 12 Peters, 520. Will the authority of these cases be disregarded and the constitutionality of the incoming government prejudged by your honors in the very hour when the people's representatives and Governor are assembling to assume their official functions?

Let us contemplate the future, if this jurisdiction which you are invited to assume is exercised. Suppose you discharge Rodriguez on the ground that the late election was illegal; you cannot control the judgment of the Legislature elect, which will assemble, organize, and inaugu--

rate a Governor. The various county officers elect will be commissioned, and it requires no prophet to foresee that under the auspices of a majority of forty thousand they will qualify and enter on the discharge of their official duties. Now, we have a statute which provides for the imprisonment of those who assume the functions of public office to which they are not entitled. You will, of course, be consistent, and the district judges will enforce your construction. We will then have the spectacle of a Supreme Court filling the prisons with officers of co-ordinate departments, from Governor down—this court remaining the sole surviving representatives of the sovereign power in the State. Contemplating such a contingency, pardon me if I ask your honors, in the language of a distinguished jurist who once presided here, " Who takes care that the laws are faithfully executed, the Governor or this court? Who administers the government, the Governor or this court?" [1]

Under such a construction of your power as the adversary claims, what would be lacking to complete your omnipotence, except the submission of the people? What authority had the Roman Triumvirs more than this? I will not compare it to the vast power of their Tribunes, who, by uttering the word "veto," could annul the decrees of the Senate, for here their power stopped ; but if your jurisdiction to pronounce the late election void be conceded, you veto the law, and in the same breath destroy the law-making power by rendering impossible its succession.

I have attempted to show, from the authorities already read, that the courts never anticipate or antagonize the legislative construction of a question political *per se* in its

---

[1] Chief Justice Roberts, in Houston Tap and Brazoria Railroad Company v. Randolph, 24 Texas, 317.

character, but I have omitted to call your honors' attention to one case of undoubted authority, which I trust will be answered in your opinion, if you decide to exercise jurisdiction, and pronounce the election illegal. The very argument now made in support of your jurisdiction was made in The People v. Mahaney, 13 Mich., 492. It was there contended by counsel that the Legislature, in passing on the election and qualification of its members, does not sit in a judicial capacity to determine what the law is, but sit under the law only to apply it as judicially expounded by the courts to the facts before them. This argument Judge Cooley, in an opinion clear and convincing, answers as follows:

"It is a sufficient answer to this argument, that while the Constitution has conferred the general judicial power of the State upon the courts and officers specified, there are certain powers of a judicial nature which, by the same instrument, are expressly conferred upon other bodies or officers; and among them is the power to judge of the qualifications, elections and returns of members of the Legislature. The terms employed clearly show that each house, in deciding, acts in a judicial capacity, and there is no clause in the Constitution which empowers this or any other court to review their action. The houses are not 'inferior courts' in the sense of the Constitution, but, as legislative organizations, are vested with certain powers of final decision, for reasons which are clearly imperative."

And again: "The question of the legal election of a member is usually a question compounded of law and fact, and the house must necessarily pass upon both. If we have the power to review the decision in one case, we have in all. If we can correct their erroneous construction of the law, we have the same power to correct any erroneous decision upon returns, qualifications or major-

ities.   It is sufficient for us to say that the Constitution
has not conferred on us this jurisdiction, and whether the
decision made is right or wrong, we shall leave it where
it has been left by the fundamental law of the land."

No one will question your power to pass on the consti-
tutionality of all acts of the Legislature, except those of
which that body is by the Constitution made the exclusive
judge for the purpose of providing its succession, and in
the other cases confided to its discretion.   No argument
is needed upon the thousand cases which proclaim your
general power to declare a legislative act unconstitutional;
their authority illustrates no issue here.   I contend not
against the general power, but for the exception—against
your absolutism—that the Constitution is over all, and
that by it and under it the Legislature possesses not only
original but supreme and exclusive jurisdiction in passing
on all questions involving the legality of a general elec-
tion at which members were chosen.

Cooley's Constitutional Law has been much quoted in
support of the power of your honors to pass on the con-
stitutionality of this election; that authority is against it.
That author says, page 41:   "It follows, therefore, that
every department of the government and every official of
every department may, at any time, when a duty is to be
performed, be required to pass upon a question of consti-
tutional construction.   Sometimes the case will be such
that the decision when made must, from the nature of
things, be conclusive, and subject to no appeal or review,
however erroneous it may be in the opinion of other de-
partments or other officers.   The first of these classes is
where by the Constitution a particular question is plainly
addressed to the discretion or judgment of some one de-
partment or officer, so that the interference of any other
department or officer, with a view to the substitution of
its own discretion or judgment in the place of that to

which the Constitution has confided the decision, would be impertinent and intrusive." He adds that in all such cases "the rule must prevail which makes the decision final." The same high authority says, page 133 : "There are certain matters which each house determines for itself and in respect to which its decision is conclusive. It chooses its own officers, etc.; it decides on the election and qualification of its own members."

The same author, adopting the language of Judge Bates, of Missouri, says, page 37 : "State constitutions measure the powers of the rulers, but they do not measure the rights of the governed. What is a constitution, and what are its objects? It is easier to tell what it is not than what it is. It is not the beginning of a community nor the origin of private rights ; it is not the fountain of law; it is not the cause but consequence of personal and political freedom; it grants no rights to the people, *but is the creature of their power—the instrument of their convenience.*" It is the creature of the people's power, and you are but creatures of the Constitution which limits your power in the very sentence which confers it, when it declares that "no person or collection of persons," being of one department, shall exercise any power properly attached to another, except in the instances "herein expressly *permitted.*" It makes each house the judge of the election of its members, and wherein does it expressly permit you to invade their power by anticipating that judgment or revising their action ?

In claiming for the Legislature exclusive jurisdiction over all such questions, I but proclaim a doctrine as old as the British House of Commons, and which has been maintained by the English people for over three hundred years against every assault, either from the crown or the courts. Your honors will find by consulting Hallam's

Constitutional History of England[1] that nearly three hundred years ago, in the reign of Mary, the very jurisdiction which is claimed for you by the relator's counsel here, was claimed for the Chancery Court of England, and successfully resisted as pertaining exclusively to the House of Commons.

It was first claimed by the crown that one Alexander Nowell was not legally elected a member of the Commons from the county of Norfolk, but who had nevertheless been recognized as a member by that body. The Speaker of the House of Commons received orders from the Queen "to signify to them her majesty's displeasure that the House had been troubled with a thing impertinent for them to deal with, and only belonging to the charge and office of the Lord Chancellor, whom she had appointed to confer with the judges about the returns for the county of Norfolk, and to act therein according to justice and right." The House, in defiance of the royal order, proceeded to appoint a committee to examine into and report the circumstances of the election, who reported the whole case, with their opinion that Nowell should retain his seat; that "they had not thought it proper to inquire of the Chancellor what he had done, because they thought it prejudicial to the privilege of the House to have the same determined by others than such as were members thereof; and though they thought very reverently of the said Lord Chancellor, and judges, *in their places*, yet in this case they took them not for judges in Parliament in this House." The House unanimously adopted the report, and allowed Nowell to retain his seat "as allowed by the judgment of this House, and *not* by the judgment of the Lord Chancellor and judges."[2]

---

[1] American edition of 1851, Vol. 4, p. 181.       [2] Dewees, 393.

47

But one other effort has since been made in England to make the legality of an election, at which a House of Commons was chosen, a question cognizable before the courts.  In the reign of James I., the King's speech to the Commons gave rise to a vindication of their rights, prepared at the House's command, in which they asserted, with respectful boldness but in explicit language, the exclusiveness of their jurisdiction over this question,[1] controverting the claim of the King for the jurisdiction of the Chancery.  They maintained—

"1. That their privileges and liberties are their right and maintenance no less than their very lands and goods.

"2. That they cannot be witheld from them, impaired or denied, but with apparent wrong to the whole state of the realm.[1]

"4. That their House is a court of record, and has ever been so esteemed.[1]

"6. That the House of Commons is the *sole* proper judge of the return of all such writs, and the election of all such members as belong to it, without which the freedom of election were not entire."  "What cause," they proceed, "we, your Commons, have to watch over our privileges is manifest in itself unto all men.  The prerogatives of princes may easily and do daily grow.  The privileges of the subject are, for the most part, at an everlasting stand.  They may, by good providence and care, be preserved; *but once lost, are not recovered but by much disquiet.*"

From that day to this no king or judge in England has dared to treat as a judicial question before the courts the legality of an election at which a House of Commons was chosen.  If such were the rights of our ancestors, boldly asserted and fearlessly maintained as their tradi-

---

[1] Parl. Hist., 1030, from Pety's Jus. Parliamentarium.

tional right under the very shadow of the throne, and in defiance of the royal order which claimed this jurisdiction for the judges, upon what pretense can your jurisdiction invade and curtail like privileges of a legislative body to-day, which are solemnly secured to it by a written constitution? Truly was it said that our "rights once lost are not recovered but with much disquiet;" and if lost, can the fact that they are usurped by a court instead of a king afford consolation?

I have attempted to show that the courts, in an unbroken series of decisions, from the days of Chief Justice Marshall to the case of State of Georgia v. Stanton, in deciding upon questions which are political *per se* in their character, adopt and follow the construction of the political department—that the jurisdiction over this question is not here, but elsewhere, because the people, in making their constitution, wrote it down in language so plain that all must understand it, "that each house shall *judge* of the elections and qualifications of its members." It will not do, in the face of these authorities, to say that this court is charged with the duty of passing on the constitutionality of *all* acts of the Legislature.

In the division of the powers of government some checks were placed also on the courts. They have no power to usurp the functions or destroy the existence of co-ordinate branches of the government.

If the Federal government, instead of suffering but yesterday a ship-load of her citizens, who were seized under her flag on the high seas by a third-rate power, and murdered without form of trial in sight of our coast, had declared war to avenge the outrage, would her courts, while her navy was thundering on the ocean in vindication of her flag, entertain on *habeas corpus* a plea that no just cause for war had occurred, or decide that none in their judgment existed? No,—because these questions were

committed by the Constitution to the judgment of another department, and placed beyond the control of the judiciary. Should the sergeant-at-arms be ordered by the House of Representatives to seize and hold in confinement a member for an indignity to the House, could you inquire on *habeas corpus* into the cause of his confinement, and, reversing the judgment of the House, release the prisoner? No,—because each house "may punish members for disorderly conduct." Should the House expel a member, their act, however arbitrary and unjust, could never be the subject of your judicial inquiry; though the action might be despotic and flagrantly wrong, which would deprive whole counties of representation by expelling their members, who but the House shall judge of it?—for of this also they are made exclusive judges by the Constitution.

If one single case can be found, from the earliest dawn of American jurisprudence until now, in which any court has ever held illegal an act under which a Legislature was chosen, and under a Constitution like ours, I will admit that I have misunderstood the theory of our government. If the Legislature can hold the general election law constitutional by seating its members, and this court can construe it as unconstitutional in passing on the election of other officers, the Constitution will cease to be a bond of order, and become a bond of anarchy. The absence of such a claim of power for the courts, until now, for so long a period and through so much partisan strife, should be conclusive against its exercise. A distinguished jurist said, in a case already commented on, in 13 Michigan, "The power of the Legislature to pass on its election is final and conclusive." If their judgment settles that question, does it not settle it for you as well as for themselves and the country? Can there be two final and distinct judgments on the same question by two separate and

independent departments in one government? Rather did not the people intend to place forever beyond the grasp of the judiciary and the executive their right to elect their representatives by denying to those departments all discretion over that question? Thus, and thus only, can their voice be heard through a free ballot.

This right of the people existed before constitutions were made, and has in all ages, wherever the English language is spoken, been valued too highly to be surrendered to the discretion of any judges, however pure. We talk of checks and balances in our Constitution, but where would be the check on a partisan judiciary which might desire to perpetuate, against the popular will, the rule of a party executive, if they may invade the province of the Legislature and nullify in advance its action concerning its own election?

The Supreme Court of Michigan, as late as 1867, deeply impressed with the danger of judicial intermeddling in general elections, said in regard to this matter: "The action of the political departments ought not to be made the subject of inquiry before the courts."

Still more pointed is the language of Judge Woodbury, in the great case of Luther v. Borden. I read from 7 Howard, 20: "If the people shall ever think of making judges supreme arbiters in political controversies, when not selected by, nor frequently amenable to them, nor at liberty to follow such various considerations in their judgments as belong to mere political questions, they will dethrone themselves and lose one of their own invaluable birthrights; building up in this way—slowly but surely—a new sovereign power in the Republic, and one more dangerous, in theory at least, than the worst elective oligarchy in the worst of times."

Judge Woodbury's opinion on this point was in full

accord with the opinion of Judge Taney, as will be seen on page 7 of same volume.

I will be excused for reminding your honors of a fact not before adverted to by any one, namely, that you have more than most men a direct personal interest in the question you are considering. It is known to all that the constitutional amendments increasing the supreme bench and changing the tenure of your office have been ratified by the people at the late election. These amendments affect directly your official existence, and I will be pardoned for expressing the belief that you will imitate the pure example of Lord Thurlow and Ellenborough, and not, without due reflection, pronounce a judgment against the people, in which you might be so directly interested.

Three times have the people of Texas since the surrender attempted to establish civil government. Once they were remanded by the Federal power to a condition of territorial vassalage; once, if we may believe the eloquent adversary, they were defrauded of their choice by a military commander; and now he himself leads the van in the third assault, and attempts, by the more insidious approaches of judicial construction, to stifle again the popular voice and substitute a reign of anarchy. Why, on the very eve of the meeting of the people's representatives, is this strange haste shown to test this question? Why does the counsel of Rodriguez assume upon the facts the position of a prosecutor? These are questions which all can answer.

By as much as the blessings of social order now in jeopardy are the dearest man can enjoy upon earth, by so much I earnestly ask you to consider well the judgment you are about to render. Your province is to preserve and build up, not to destroy. Let not anarchy take the place of order, and violence supplant quiet and security. Whatever may be your inclination, you must,

at least, doubt the existence of the jurisdiction claimed.
Let me, in the name of the people, ask you to resolve
that doubt, as it is your duty to do, in their favor.   Do
this, and from the people of Texas, who have been sorely
tried, will go up a voice of gratitude which should be
more pleasing to your honors than any benefit that can
come to you from beyond the borders of this State.

*Geo. Flournoy*, for the State.[1]

*C. B. Sabin*, in response, for relator.

*A. J. Hamilton*, also for relator,[2] stated that a good
deal had been said about trying to oust the incoming
Legislature, when it was well known that the court had
no jurisdiction over the qualifications or eligibility of
members of that body, each house being the judges of
the qualifications of its own members ; that the court
was not expected to go out of its way to say one solitary
word about the election, with regard to who is elected
and who is not.   You are called on to decide whether
it is an offense for a person to vote twice at an election
that is not valid. ' He then argued that Section 33 of Ar-
ticle 3 of the Constititution, instead of being in conflict
with Section 6 of the same article, was in perfect harmony
with it; that the framers of the Constitution were not re-
quired to furnish the machinery and provide the mode of
holding elections, and that no election could be held un-
less the Legislature had made laws providing the mode

[1] Mr. Flournoy made an able argument, in which he contended that the
question was a political one, and denying the power of the court to pass on
the legality of a general election.   We regret his failure to furnish it for in-
sertion.

[2] Mr. Hamilton having failed to furnish his remarks for insertion, they are
here reported as published at the time from stenographer's report.

of conducting elections, but not under unconstitutional laws.

The question before the court is not one of jurisdiction; the case is in your hands; there is no necessity for arguing the question as to whether you can take jurisdiction. There may be a question sometimes as to whether another court cannot have prior jurisdiction, and the prisoner remanded back to that court. But what would be the sense of a writ of *habeas corpus* if this were to be done? It is merely an expeditious manner of arriving at a decision as to whether a person is guilty of any offense. We raise no question as to whether the officer who issued the writ for the arrest of our client was illegally elected or not; he was at least a *de facto* officer, if not a *de jure* officer. We do not complain of any irregularity in the writ nor in the form of arrest, but we do complain that it discloses a charge of violation of a law that does not exist. The opposing counsel ask that the prisoner be remanded to Harris county; but your honors well know that that would destroy the object of the writ of *habeas corpus*.

He then reviewed the various cases which had been cited by opposing counsel, and attempted to show the entire lack of analogy between them and the case before the court, and wound up his argument as follows:

I think I have successfully answered the arguments with regard to jurisdiction. It is not a question of jurisdiction that is before you, but it is as to what your practice is to be. In making your decisions you may or may not give your reasons, as you see proper. If you enlarge the prisoner on the grounds claimed by us, of course your reasons are understood; but if you do not enlarge him, it would seem due to the bar and to the country that your reasons should be given.

Gentlemen on the other side have gone outside of the

constitutional question, and called our attention to their 50,000 Democratic majority, the overwhelming expression of the will of the people, and the grave consequences likely to arise from opposing that expressed will. Are we here for the purpose of trying the Democratic or Republican parties? Is the question before the court as to which is the strongest party? Were I to make such an argument, I should bow my head in submission were your honors to stop me, rebuke me, and even fine me.

I am said to be here surreptitiously, to hurt somebody who may have been elected. I do not know what effect a decision in our favor may have upon the cases of persons recently elected. I do not know, and I care as little as I know. If I did know, I should fearlessly do my duty in the premises.

My course since the war has been closely scrutinized and severely criticised. I am not ashamed of my public record during that time. I have never by a single act violated any constitutional oath of office by which I was invested with power. The failure to reconstruct this State in 1866 has been attributed to me, but they cannot lay this to my charge. It is solely the fault of the gentlemen who make the charge. Had they listened to my earnest advice at that time, the State would not have had to be reconstructed over again. But they would not heed me. They thought they had everything in their own hands. I told them that the government of the United States would not allow them in their conventions and legislatures to disregard and trample upon the rights of free American citizens. I could not have prevented the interference of the national government had I made the effort, nor could the voices of ten thousand such men as I.

We are told by opposing counsel that the peace of society is involved in the decision of this case, that society is in danger of being disturbed, disrupted. Does civil

government in this State hinge upon the confinement or enlargement of my client? I think not; most assuredly not. I am charged with opposing and disturbing these gentlemen and their partisan friends in the past, and now they say I am here again for the same purpose. I do not take my lessons in patriotism from gentlemen who, in 1861, were members of a mere mob, styling itself a State Convention, which was called by about forty persons, and which gloried in overthrowing the State government and tearing down the United States flag. I never fought against the flag of my country. Neither did I learn those lessons in a foreign land, in Mexico, under a carpet-bag Emperor, who was afterwards shot for interfering with the constitutional rights and liberties of a free people.

There is not an act of my public life that my children need blush for when I am at rest. I have at least always been loyal to my country. In the beginning of the confusion and trouble I gave the question my honest consideration, and having decided in favor of the integrity of the nation, from that time to this, wherever the path of my duty led, I have trod it with an unfaltering step.

As to the indirect interest your honors are charged by opposing counsel with having in the decision of this question, it seems to me that they have sought to appeal to your timidity, to your cowardice. But I am satisfied that the gentlemen who fill this honorable bench are men—physically, intellectually, morally—who will scorn such unworthy flings and do their duty regardless of all outside influence.

You are told that society will be disrupted, and that anarchy and revolution will follow, if your decision should be in accordance with our argument. It would have been well had these gentlemen been equally solicitous a few years ago about the peace of society and the

disruption of the government.    We all might now be
much better off and much happier.    Such arguments
come too late from such a source.    Who are they who
will produce this state of chaos?    A few officers who are
to be kept out of office for a few weeks or even months.
Is this to be a sufficient cause for a revolution?

We are told that we are to be placed under military
law.    I hope not.    I deprecate that form of government.
We have had enough of it,— and too much, could it
have been avoided.    The government of the United States
has no desire for such a thing.    It will never take place
in this State unless the people of the State bring it upon
themselves, as they did once before.    No man labored
harder than I did to free this people from military gov-
ernment, and I should certainly not try to bring it upon
them again.    The Constitution provides that, "Congress
shall guarantee to each State a *republican* form of gov-
ernment"—not a military government; and yet, when
this section is invoked by us, gentlemen say we threaten
them with military law.    In this they pay a high compli-
ment to the United States government.    Should a violent
disturbance take place the government might feel called
upon to interfere; but it will not seek an opportunity to
impose military government upon Texas.    But by fol-
lowing the advice of violent leaders it may become neces-
sary for the government to lay its heavy hand upon us.

I see no cause for anxiety.    There will be nothing like
a lapse of State government.    At the most, it will only
be a delay of perhaps not more than two months.    It
might postpone the meeting of the Legislature.    But this
is not the question your honors are to decide.    You have
nothing whatever to do with any of these questions or
consequences.    You are to decide the case before your
court according to the law and the evidence, without any
reference to the interests of individuals involved therein.

WALKER, J.—We trust it will not be questioned that this case has been patiently investigated, as its importance, viewed in any light it may be, demands.

The writ of *habeas corpus* under our system of law is perhaps somewhat peculiar in its functions. We are not left entirely to common law rules or definitions.

The framers of our penal code have directed who is entitled to the writ, when it may be resorted to, and in what manner judicial investigations under it are to be conducted.

Its scope in the case at bar, and the powers of the court, have been the topics of able discussion almost throughout the entire trial. Had our own reports been carefully examined, this discussion might have been greatly abridged.

The present bench may, with becoming modesty, claim the merit of having followed in beaten paths.

Our distinguished predecessors have established all the necessary jurisdictional boundaries of this court in like cases. (See *Ex Parte* Coupland, 26 Texas ; *Ex Parte* Mayer ; The State v. Sparks ; *Ex Parte* Blumer, 27 Texas.) In these cases the gravest constitutional questions, affecting the validity of one or more acts of the Confederate Congress, were discussed and decided. Questions also touching the law of nations were brought under discussion.

The circumstance that these relators were military prisoners, and that the cases were decided during the late civil war, will not detract from their authority, if they are carefully examined and found to have been decided by such men and jurists as Wheeler, Bell, Moore, Roberts and Reeves.

But, before examining further the question of our jurisdiction, let us inquire what is the nature of the case before us.

Had no evidence been introduced by the State other than the affidavit for the warrant of arrest and the return, it was the opinion, as announced, of a majority of the court, that the relator was entitled to his discharge, under Article 2426, Paschal's Digest. But immediately after the announcement of this opinion, a witness was put upon the stand by the State, to-wit, the judge who issued the warrant, who stated to the court that the witness who made the affidavit and had been brought before the court by attachment, was present, and also several other witnesses, whose evidence would establish the truth of the charge brought against the relator. It then became the duty of the court to see that these witnesses were called and examined.

The first of these witnesses stated that he was an officer employed in the registration of voters in the city of Houston, and that he thought he issued a certificate of registration to the relator prior to the late election, held on the second day of December, 1873; that shortly after the election he had interested himself in endeavoring to detect illegal voters who had voted at the polls at the city of Houston, and that he had ascertained that six hundred illegal votes had been cast at those polls by persons brought there over the railroads for that purpose; that he had learned that the relator was not a resident of Harris county, but that he lived at the city of Austin, which is in Travis county, and that in conversation with the relator, he had virtually admitted to the witness that he had voted twice in the city of Houston on the second day of December, 1873.

Three other witnesses were then put upon the stand, one after another, who testified about to the same state of facts; that the relator was one of a company of twenty-nine Mexicans, who shortly previous to the election had been taken down over the railroad from Austin, that they

might vote at Houston, and that they, each of them, had seen the relator vote at two different precincts in the city of Houston on the second day of December, 1873, and that the relator had voted by his own name once, but they could not tell by what name he voted the second time.

The State, apparently for the purpose of breaking down the evidence of these witnesses, introduced the tally sheets or poll books from the different precincts, showing the number and names of the voters who cast their ballots at Houston on the second day of December, 1873. These lists were identified by a witness of most respectable character and deportment, but his testimony went no further than to identify the tally sheets, without proving that they had been correctly kept. They were nevertheless inspected by the clerk of this court, who then testified that the name of the relator appears but once on any of the poll books. This testimony, though important, has not established the innocence nor removed the presumption of probable cause from the mind of the court.

Had the relator then no other defense he would not be entitled, in the opinion of the court, to his enlargement, and we are glad that this opinion has been concurred in by at least one of the able counsel for the State, as well as the counsel for the relator.

But the relator now claims that he is entitled to his enlargement because he has violated no valid law of the State of Texas, and this is the point of gravest contest before this court. It is denied by the counsel for the State that the court is authorized to determine this question, and we are told that we must not decide whether this man has violated the law or not, because, forsooth, such a decision as might be rendered by the court would involve the State in anarchy and deny the legal existence

of a co-ordinate branch of the government which has the paramount right to determine this question. Much of the argument on this point must sound strangely in the ears of lawyers, judges and statesmen. But the argument is made with such apparent sincerity, and the point raised so boldly, that we will not assume to settle it in our own language, but by more able authority than our opinion might be regarded.

The following extracts from the ablest elementary writers and most authoritative sources must settle the question to whom this jurisdiction belongs, and whatever may be our regret at being called on to decide a question thought to be fraught with the grave results which have been pointed out in the argument so repeatedly and so eloquently, we are not unmindful of the fact that this, though an unpleasant duty it may be, is one which our office and our oaths devolve upon us.

Those who administer the co-ordinate branches of the government are alike sworn to obey and defend the paramount law. The people, in their fundamental law, have required this of each one of us. In any question involving no more than a right of property, but especially in a question involving personal liberty, we should be grossly derelict in duty were we to fail to point out and administer the law as it is.

The Constitution of our State, ordained and adopted by the people, is the paramount law, to which every other law or enactment of the Legislature of the State must be subordinate; and when an act of the Legislature is in conflict with the Constitution, and the question is brought before us in any real and proper case, it is our bounden duty to declare it so. But it has been insisted by the State's counsel that we were trying a feigned issue, and that the relator and his counsel have made themselves guilty of a gross contempt of this court in suing out and

prosecuting this writ. We are utterly unable to detect any fraud in this case, and we are alike unable to find the slightest justification for the charge.

Four witnesses, all men of adult age, have deliberately perjured themselves before this court on the trial of this cause, or the case is real. The question is no less in its gravity than that involved in the charge of felony.

We have more particularly alluded to the evidence in this opinion than we otherwise might have done, that this charge may be forever set at rest by the testimony in the case.

But touching the question of our jurisdiction and our duty to decide whether the relator is guilty of a felony or not, we shall present the following authorities, first remarking that if the law under which the late election, held on the second of December, 1873, is in conflict with the 6th Section of the 3d Article of the Constitution, then the act is void in so far as it conflicts with the Constitution, and the relator has not voted at any election provided for by the law of the State, and is not guilty of the crime with which he is charged. The election must be legal and valid to subject a party to the penalty of the statute against illegal voting. (The State v. Williams, 25 Maine, 561.) "In an action for bribery it is not enough to show that an election was held *de facto*, and that the defendant bribed a person who voted as an elector on that occasion; a regular election should be proved." (Reed v. Lamb, 6 Jur., N. S., 828; 29 L. J. Exch., 452; 6 H. & N., 75.)

The following lengthy extract from the Commentaries of Chancellor Kent, Vol. 1, Section 20, has its appropriate place here, and must, we think, satisfy every professional mind:

"The principle in the English government that the Parliament is emnipotent does not prevail in the United States; though, if there be any constitutional objection to

a statute, it is with us as absolute and uncontrollable as laws flowing from the sovereign power under any form of government.  But in this and in all other countries where there is a written constitution designating the powers and duties of the legislative as well as of the other departments of the government, an act of the Legislature may be void as being against the Constitution.  The law with us must conform, in the first place, to the Constitution of the United States, and then to the subordinate Constitution of its particular State ; and if it infringe the provisions of either, it is so far void.   The courts of justice have a right and are in duty bound to bring every law to the test of the Constitution, and to regard the Constitution, first, of the United States, and then of their own State, as the paramount or Supreme law to which every inferior or derivative power and regulation must conform.

"The Constitution is the act of the people, speaking in their original character, and defining the permanent conditions of the social alliance ; and there can be no doubt on the point with us, that every act of the legislative power contrary to the true intent and meaning of the Constitution, is absolutely null and void.  The judicial department is the proper power in the government to determine whether a statute be or be not constitutional.  The interpretation or construction of the Constitution is as much a judicial act, and requires the exercise of the same legal discretion, as the interpretation or construction of a law.  To contend that the courts of justice must obey the requisitions of an act of the Legislature, when it appears to them to have been passed in violation of the Constitution, would be to contend that the law is superior to the Constitution, and that the judges had no right to look into it and regard it as paramount.  It would be rendering the power of the Legislature greater than that of its principal, and be declaring that the will of only one concur-

48

rent and co-ordinate department of the subordinate authorities, under the Constitution, was absolute over the other departments, and competent to control, according to its own will and pleasure, the whole fabric of the government and the fundamental laws on which it rested. To attempt to impose restraints upon the exercise of the legislative power would be fruitless, if the constitutional provisions were left without any power in the government to guard and enforce them.

"From the mass of powers necessarily vested in the Legislature, and the active and sovereign nature of those powers; from the numerous bodies of which the Legislature is composed, the popular sympathies which it excites, and its immediate dependence upon the people, by the means of frequent periodical elections, it follows that the legislative department of the government will have a decided superiority of influence. It is constantly acting upon all the great interests in society, and agitating its hopes and fears. It is liable to be constantly swayed by popular prejudice and passion, and it is difficult to keep it from pressing with injurious weight upon the constitutional rights and privileges of the other departments.

"An independent judiciary, venerable by its gravity, its dignity and its wisdom, and deliberating with entire serenity and moderation, is peculiarly fitted for the exalted duty of expounding the Constitution and trying the validity of statutes by that standard. It is only by the free exercise of this power that courts of justice are enabled to repel assaults, and to protect every part of the government, and every member of the community, from undue and destructive innovations upon their chartered rights. It has accordingly become a settled principle in the legal polity of this country; that it belongs to the judicial power, as a matter of right and duty, to declare every act of the Legislature, made in violation of the Constitu-

tion, or of any provision of it, null and void. The progress of this doctrine, and the manner in which it has been discussed and established, is worthy of notice. It has been very ably examined in The Federalist, and its solidity vindicated by unanswerable arguments; but it was not until the year 1792 that it seems to have received a judicial consideration. In Hayburn's case, which came before the Circuit Court of the United States for the district of New York, in April, 1791, the judges proceeded with the utmost delicacy and caution to declare an act of Congress, assigning ministerial duties to the circuit courts, to be unconstitutional. The court laid down the position, that Congress cannot constitutionally assign to the judicial power any duties which are not strictly judicial, and that the act in question was not obligatory upon the court. But they nevertheless proceeded, voluntarily and *ex gratia*, as commissioners, to execute the duties of the act. In Pennsylvania and North Carolina the circuit courts of the United States within those districts equally held the act not binding upon them, because the Legislature had no right or power to assign to them duties not judicial; but they were not so accommodating as the Circuit Court of New York, for they declined to act under the law in any capacity.

"In 1792, the Supreme Court of South Carolina, in the case of Bowman v. Middleton, went further, and set aside an act of the colony Legislature, as being against common right and the principle of *Magna Charta*, for it took away the freehold of one man and vested it in another, without any compensation, or any previous attempt to determine the right.

"They declared the act to be *ipso facto* void, and that no length of time could give it validity. This was not strictly a question arising from any special provision of the State Constitution; but the court proceeded upon

those great fundamental principles which support all government and property, and which have been supposed by many judges in England to be sufficient to check and control the regulations of an act of Parliament.

"The next case in which the power of the judiciary to disregard or set aside a statute for being repugnant to the Constitution, was one that came before Judge Paterson at Philadelphia, in April, 1795. He asserted the duty of the court and the paramount authority of the Constitution in remarkably clear and decided language. That was a case of an act of Pennsylvania, which he held to be unconstitutional and not binding. He insisted that the Constitution was certain and fixed, and contained the permanent will of the people, and was the supreme law and paramount to the power of the Legislature, and could only be revoked or altered by the authority that made it; that the Legislature was the creature of the Constitution, and owed its existence to the Constitution, and derived its powers from the Constitution, and all its acts must be conformable to it, or else they will be void.

"The same question afterwards arose before the Supreme Court of South Carolina, in the case of Lindsay v. The Charleston Commissioners, and the power of the Legislature to take private property for necessary public purposes, as for a public street, was freely discussed; and though the judges were equally divided on the question, whether it was a case in which the party was entitled to compensation, those who held him so entitled held also that the law was unconstitutional and inoperative until the compensation was made. The judges in exercising that high authority claimed to be only the administrators of the public will, and the law was void, not because the judges had any control over the legislative power, but

because the will of the people declared in the Constitution was paramount to that of their representatives expressed in the law.

"In Whittington v. Polk, it was decided, in 1802, by the general court of Maryland, with great clearness and force, that an act of the Legislature repugnant to the Constitution was void, and that the courts had a right to determine when it was so void. Hitherto this question, as we have seen, was confined to some of the State courts, and to the subordinate or circuit courts of the United States. But in Marbury v. Madison (1 Cranch, 131), the subject was brought under the consideration of the Supreme Court of the United States, and received a clear and elaborate discussion. The power and duty of the judiciary to disregard an unconstitutional act of Congress or of any State Legislature were declared in an argument approaching to the precision and certainty of a mathematical demonstration.

"'The question,' said Chief Justice Marshall, "'was whether an act repugnant to the Constitution can become a law of the land, and it was one deeply interesting to the United States. The powers of the Legislature are defined and limited by a written Constitution. But to what purpose is that limitation if those limits may at any time be passed? The distinction between a government with limited and unlimited powers is abolished, if those limits do not confine the persons on whom they are imposed, and if acts prohibited and acts allowed are of equal obligation. If the Constitution does not control any legislative act repugnant to it, then the Legislature may alter the Constitution by an ordinary act. The theory of every government with a written Constitution, forming the fundamental and paramount law of the nation, must be that an act of the Legislature repugnant to the Constitution is void. If void, it cannot bind the courts and oblige them

to give it effect, for this would be to overthrow in fact
what was established in theory, and to make that opera-
tive in law which is not law. It is the province and duty
of the judicial department to say what the law is, and if
two laws conflict with each other to decide on the opera-
tion of each. So, if the law be in opposition to the Con-
stitution, and both apply to a particular case, the court
must either decide the case conformable to the law, dis-
regarding the Constitution, or conformably to the Consti-
tution, disregarding the law. If the Constitution be supe-
rior to an act of the Legislature, the courts must decide
between these conflicting rules; and how can they close
their eyes on the Constitution and see only the law?
This great question may be regarded as now finally set-
tled, and I consider it to be one of the most interesting
points in favor of constitutional liberty, and of the secu-
rity of property in this country, that has ever been judi-
cially determined.' "

The learned commentator cites numerous decisions in
the different States affirming the doctrine, which we think
it unnecessary to refer to particularly.

We quote further from Potter's Dwarris (Chap. 10) on
Statutes and Constitutions, a work of acknowledged
merit:

"It is to be observed, in this connection, that the Con-
stitutions, National and State, having established these
three separate departments, have also assigned to each, by
true implications, distinct powers and duties; and from
their distinct functions and the objects committed to
them, there are also the necessary implications, which
have grown into a maxim, that forbids each of them to en-
croach upon the powers and duties of each of the others.
These departments are co-ordinate in degree to the ex-
tent of the powers delegated to each of them. Each, in
the exercise of its powers, is independent of the other, but

all rightfully done by either is binding upon the other. The Constitution is supreme over all of them, because the people who ratified it have made it so. Consequently, any-, thing which may be done, and which is unauthorized by it, is unlawful. (Dodge v. Woolsey, 18 How. U. S. R.) The Constitution is certain and fixed; it contains the permanent will of the people, and is the supreme law of the land. It is paramount to the power of the Legislature, and can be revoked or altered only by the authority that made it. The life-giving principle and the death-doing stroke must proceed from the same hand. What are Legislatures? Creatures of the Constitution; they owe their existence to the Constitution; they derive their powers from the Constitution. The Constitution is the work or the will of the people themselves, in their original, sovereign and unlimited capacity. Law is the work or will of the Legislature, in their derivative and subordinate capacity. The one is the work of the creator, the other of the creature. The Constitution fixes limits to the exercise of legislative authority, and prescribes the orbit within which it must move. The Constitution is the sun of the political system, around which all legislative, executive and judicial bodies must revolve; and every act of the Legislature repugnant to the Constitution is absolutely void.

"There is an inherent and practical difficulty always in confining power within proper boundaries. This is eminently true in regard to legislative and judicial duties under our system. All history and experience shows the disposition of legislative bodies to disregard private rights and to overstep the limits of that department of power. Nor is it without example that the judiciary, whose duty it is so to declare when laws are improperly and unconstitutionally enacted, have, in turn, acting in a spirit of jealousy at the encroachments of the Legislature,

sometimes also overstepped their own sphere of duty; but these have been infrequent, and less conflict has resulted than perhaps under any other system that has ever been devised. Experience and contemporary practice in the exercise of juducial power confirms the idea that the framers intended that there should be a constitutional method of giving efficacy to constitutional provisions. What, for instance, would avail restrictions upon legislative power without some constitutional mode of enforcing the observance of them? The several States, by the national Constitution, are prohibited from doing a variety of things, some of which are imcompatible with the interests of the union, others with the principles of good government. No sensible man will believe that such prohibitions would always be scrupulously regarded without the effectual power of the national or State judiciaries to restrain and correct the infractions of power. This judicial power must possess a direct negative on unconstitutional laws, or the Legislatures remain unrestrained and, humanely speaking, omnipotent.

"Those who controvert the principle that the Constitution is to be considered, in court, as a paramount law, are reduced to the necessity of maintaining that courts must close their eyes upon the Constitution and see only the law. This doctrine would subvert the very foundation of all written constitutions. It would declare that an act which, according to the principles and theory of our government, is entirely void, is yet in practice completely obligatory. It would declare that if the Legislature shall do what is expressly forbidden, such act, notwithstanding the express prohibition, is in reality effectual. It would be giving to the Legislature a practical and real omnipotence, with the same breath which professes to restrict their powers within narrow limits. It is prescribing limits, and declaring that those limits

Ex Parte Rodriquez. 761

may be passed at pleasure; that it thus reduces to nothing what we have deemed the greatest improvement on political institutions—a written Constitution—would of itself be sufficient in America, where written constitutions have been viewed with so much reverence, for rejecting the construction.

" While the Legislature cannot overstep the prescribed bounds of power contained in the Constitution, the judicial power is also limited, and they are confined to the duty of ascertaining whether any given laws do violate the Constitution. It is not for the judiciary or the executive department to inquire whether the Legislature has violated the genius of the government, or the general principles of liberty, or the rights of man, or whether these acts are wise or expedient, but only whether the Legislature has transcended the limits prescribed by the fundamental law.

"In the highest court of the State of New York, in the case of Cochran v. Van Surley (20 Wend.), it was declared 'that it was only in express constitutional provisions limiting legislative power, and controlling the temporary will of a majority by a permanent and paramount law settled by the deliberate wisdom of the nation, that a safe and solid ground for the authority of courts of justice could be found to declare void any legislative enactment. Any assumption of authority beyond this would be to place in the hands of the judiciary powers too great and too undefined either for its own security or for the protection of private rights.' "

Cooley's Constitutional Limitations, which has been liberally cited by the counsel on both sides of this case, states the rule as follows: " The legislative and judicial are co-ordinate departments of the government, of equal dignity; each is alike supreme in the exercise of its proper functions, and cannot, directly or indirectly, while acting

within the limits of its authority, be subjected to the control or supervision of the other, without an unwarrantable assumption by that other of power which, by the Constitution, is not conferred upon it. The Constitution apportions the powers of government, but it does not make any one of the three departments subordinate to another, when exercising the trust committed to it. The courts may declare legislative enactments unconstitutional and void in some cases, but not because the judicial power is superior in degree or dignity to the legislative. Being required to declare what the law is in the cases which come before them, they must enforce the Constitution as the paramount law, whenever a legislative enactment comes in conflict with it. In exercising this high authority, the judges claim no judicial supremacy; they are only the administrators of the public will. If an act of the Legislature is held void, it is not because the judges have any control over the legislative power, but because the act is forbidden by the Constitution, and because the will of the people, which is therein declared, is paramount to that of their representatives expressed in any law." (Chap. 7.) In the note on page 168, this learned author refers to a large number of authorities which may be consulted. We make no other apology for the introduction of these lengthy extracts than that they are taken from the most incontrovertible authorities, and better illustrate the law than we should find ourselves able to do were we to employ our own language.

We attach the greatest possible importance to a fair understanding of this branch of the case. We have been loudly warned against judicial usurpation, and it is our duty to show that the ground we occupy has been most ably held by those whose light we are proud to follow.

It has been said that no portion of the political history of mankind is more full of instructive lessons on this

subject, or contains more striking proof of faction, instability and misery of States under the single dominion of an unchecked assembly, than that of the Italian republics of the middle ages. They rose in splendor and sank in gloom between the fall of the Eastern and Western empire of the Romans. They had a single unchecked and unbalanced legislative assembly. These assemblies in rapid succession robbed the people of liberty and ended the republics in disgrace.

The case of *Ex Parte* Milligan, 4 Wallace, 2, is an authority which may be added to those already cited from our own reports as going to show how far courts are authorized to go in determining constitutional questions in a proceeding on *habeas corpus*. In this case the constitutionality of an act of Congress was called in question (Act of March 3, 1863), and was held to be in conflict with that provision of the Constitution which guarantees the right of trial by jury.

It has been urged with much ability and apparent candor that it is the duty of this court to remand this case to the jurisdiction of the judge who issued the warrant of arrest, that court having acquired a jurisdiction of the case prior to our own. This argument would come with much force if addressed to a court having no more than a common law jurisdiction; but the statute (Art. 157 of the Penal Code) plainly points out our duty. We must examine the writ and papers attached to it; we must examine into the legal cause of the imprisonment; and if evidence be offered, it is our duty to examine and weigh that evidence and determine the case accordingly.

Chief Justice Wilmot, in his opinion, page 106, says: " The writ is not framed or adapted to litigating facts; it is a summary, short way of taking the opinion of the court on a matter of law, where the facts are disclosed and admitted; it puts the case exactly in the situation as

if an action for false imprisonment had been brought and the defendant had set forth the facts to justify the imprisonment, and the plaintiff had demurred to the plea."

Hurd on *Habeas Corpus*, page 292, quoting the case of Hovey and Wife, 7 Blackf., 559, says, that where it is desired to test the sufficiency of the return in law, it may be done on a motion to discharge the prisoner, which has the effect of a demurrer. On this motion the return is conceded to be true. "The return," said Lord Denman, "in Watson's case, 36 Eng. C. L., 237, must necessarily be received as true in all particulars that appeared upon it in the present stage, in which its sufficiency alone is examined." But we, as before shown, are bound to go further, if evidence be offered, than the examination of the case on demurrer; if evidence be offered, we are bound to consider it. In this case we not only have the relator's motion for his discharge, which presents the law of the case as if on demurrer at common law, but we have the somewhat anomalous practice of a motion from the State to discharge the prisoner, accompanied by a declaration from counsel in advance, that the State could show no case against the relator. But we have regarded it as our bounden duty to examine the case for ourselves with no other object or motive than a fair and impartial administration of the law. We shall now proceed to the examination of the authorities referred to *pro* and *con* in the argument. To prove that the question before us is purely political, and one over which our jurisdiction does not extend, the case of Luther v. Borden *et al.*, 7 Howard, 2, is referred to and relied on. This case grew out of the unfortunate political struggle which took place in Rhode Island in the year 1842. The case is more historical than legal, as no important legal principle was decided in it which had not before been decided. There was a struggle between two political parties of which the

court could not take cognizance. The action was one of trespass *quare clausum fregit*, to which certain pleas were filed. It was alleged, that there was an insurrection of men in arms to overthrow the government of the State by military force; that, in defense of the government, martial law was declared by the General Assembly of the State; that the plaintiff was aiding and abetting the insurrection; that, at the time the trespasses were committed, the State was under martial law, and the defendants were enrolled in the 4th Company of Infantry, in the town of Warren, under the command of J. T. Child. The defendants were ordered to arrest the plaintiff, and, if necessary, to break and enter his dwelling house; that it was necessary, and they did break and enter said dwelling house to search the same, doing as little injury as possible. To these pleas a general replication was filed, and thus an issue was tendered. Now, the court say in this case: "The question, whether or not a majority of those persons entitled to suffrage voted to adopt a constitution, cannot be settled in a judicial proceeding. The Constitution of the United States has treated the subject as political in its nature, and placed the power of recognizing a State government in the hands of Congress. Under the existing legislation of Congress, the exercise of this power by courts would be entirely inconsistent with that legislation." These were certainly very good reasons, and such, indeed, as we profoundly respect, for the Federal courts not interfering to settle the political quarrels of the people; and, indeed, when this case was before the court, Congress had already recognized, and so had the executive, the charter government of Rhode Island. But the State courts of Rhode Island took up another branch of the question, and Thomas W. Dorr, the leader of the rebellion, was, on the twenty-fifth of June, 1844, tried and convicted of treason, and sentenced

to imprisonment and hard labor for life, but was liberated a year afterwards by an act of amnesty.

We are referred to a passage in Hallam's Constitutional History of England, page 200, to a question which arose in the reign of Mary. A writ had been issued for an election in the county of Norfolk, and one Alexander Nowell had been returned. The question arose in the Commons as to his qualifications. A serious question then arose between the Lord Chancellor and the House of Commons as to the right of determining the qualifications of the member. But this question can never arise in any of the American States, under their present constitutions, for it has never been denied that to each house of every Legislature belongs the exclusive right of determining the election and qualifications of their members. But we apprehend that no intelligent lawyer will for one moment contend that they have a paramount right to determine the constitutionality of their laws.

But we have already discussed this question at perhaps unnecessary length. English authorities cannot be resorted to to determine this question; for the reason that the English Parliament is not restricted in its power to enact laws; the power is uncontrolled. Parliament, with the concurrence of the crown, has established whatever written Constitution the people of Great Britain have. They are the makers, and, if they choose, may become the breakers, of the Constitution; but if this were done, we apprehend that it would be at the risk of popular revolt. But Parliament has ever been the guardian of English liberty, and has secured, from time to time, the most important accessions to *Magna Charta*, the beginning of English liberty from the crown. But in this country the people make and ordain their own constitutions, and grant no power to their representatives to alter or break them. That under our constitutions each house

is the judge of the qualifications, elections and returns of its members, is a proposition never doubted; and so far as it necessarily implies a judicial power, it is conceded to all legislative bodies.   This is all that is decided in Drake v. Mahaney, 13 Mich., 481.

But that the State courts and the Federal courts have always exercised the undisputed power of determining the validity of laws and their constitutionality, is a fact fully illustrated by the largest number of cases, and by the history of the country.   That the courts have always felt this a delicate but obligatory duty, is fully expressed by Chief Justice Marshall, in the celebrated case of Gibbons v. Ogden, 9 Wheaton, page 2.   The case of Foster & Elan v. Neilson, 2 Peters, is no authority in this case.

The construction of a treaty between two nations is not to be left to the courts of one or the other.   Spain would not have submitted the construction of the treaty of Ildefonso to an American court, nor would the United States to a Spanish court.   These matters are political, but are sometimes by mutual consent referred to joint commissions composed of learned lawyers.   The case of Ableman v. Booth (21 How.) establishes no precedent for our government in this case.   The case arose under the fugitive slave law of 1850, and involved a conflict of jurisdiction between the State court of Wisconsin and the Circuit Court of the United States.   The court did, however, decide the act constitutional.

In *Ex Parte* Strahl, 16 Iowa, 369, the same question was raised which came before the court in *Ex Parte* Strang, 21 Ohio S., and was similarly decided, neither court finding it necessary to determine the constitutional question, which was not necessarily involved.   The acts of a *de facto* officer were held to be binding, and it was not necessary to determine whether the officer acted *de jure* or not.   17 Wisconsin, 521, and Ballow v. Bangs, 24 Illinois,

184, are to the same effect. But in none of these cases do the court decline to adjudicate the constitutional question, had it been necessarily involved.

The case of Smith v. Halfacre, 6 How., Miss., 582, is a somewhat peculiar case. The suit was brought on a promissory note, but Mr. Clayton, who appeared as counsel for the appellant, said in his opening remarks to the court, "The question *intended* to be presented by the record in this case is whether T. W. Huling or James M. Mowry be the judge of the eighth judicial district of this State." And this was the issue presented and decided by the court on a construction of the State Constitution, and yet we must say that this looks very much like a feigned case.

In the case of Miller & Gibson v. The State, 3 Ohio S., Chief Justice Thurman remarks: "A statute may, upon its face, be repugnant to the Constitution, and therefore void. No matter how regular may have been the steps by which it was enacted, and although the power was at one time very seriously denied, yet it is no longer to be doubted that the courts are *bound* to treat such a statute as a mere nullity." We must be permitted to express our high regard for this distinguished jurist, now equally distinguished as a member of the United States Senate.

Courts will follow the construction of a law which has been adopted by the Legislature, unless repugnant to sound rules of construction or the plain letter of the act. (6 Mass., 416.) In Rison *et al.* v. Tarr, 24 Ark., 161, we find an authority for adjudicating the act of March 31, 1873. The court there determined the test oath to be incompatible with the Constitution of the State. In Deering v. The York and Cumberland Railroad Company, 31 Maine, 172, the court very properly held that upon a bill in equity, praying for an injunction and for

relief, an act of the Legislature ought not to be adjudged unconstitutional on a mere preliminary hearing for. the injunction, and before an examination into the general merits of the bill.   I think we should hold the same thing. · In Hoover v. Wood, 9 Ind., 286, it is said, "While the courts cannot shun the discussion of constitutional questions when properly presented, they will not go out of the way to find such topics, nor seek to draw in such weighty matters collaterally or on trivial occasions." We have announced the same opinion of the law from this bench during the progress of this trial.   In Thorn v. Cramer *et al.*, 15 Barbour, the Supreme Court of New York pronounced an act of the Legislature to establish free schools throughout the State unconstitutional and void.

It would seem that similar arguments were used upon the hearing that have been advanced in this case.   The court may be said to have replied to those arguments in the following language and terms : "But it may be asked, are not majorities to govern ?   We answer, they are to govern *only in the prescribed form*.   If the majority wish the passage of a certain law, they must elect such representatives as will make the law in the mode pointed out in the Constitution.   The minority have consented to be governed by such statutes as are passed in the constitutional manner ; but they have never consented to submit to such laws as the majority should enact at the polls ; and the Constitution is designed for the protection of minorities against the caprices, recklessness or prejudices of majorities.   In Parker v. The Commonwealth, 6 Barr, the Supreme Court of Pennsylvania held an act of the Legislature unconstitutional and void, because the Legislature had submitted it to be voted on in certain counties. In Maybury *et al.* v. Kelley, 1 Kansas, 125, the court say: "It is claimed by counsel for plaintiffs in error, that the point raised by the instruction is that inferior

courts and ministerial officers have no right to judge of the constitutionality of a law passed by a Legislature. Such is undoubtedly the object of the instruction. But is this law? If so, a court created to interpret the law must not disregard the Constitution in forming its opinions. The Constitution is law—the fundamental law—and must as much be taken into consideration by a justice of the peace as any other tribunal. Where two laws apparently conflict, it is the duty of all courts to construe them. If the conflict is irreconcilable, they must decide which is to prevail, and the Constitution is not an exception to this rule of construction. If a law were passed in open, flagrant violation of the Constitution, should a justice of the peace regard the law and pay no attention to the constitutional provision? If that is his duty in a plain case, is it less so when the construction becomes more difficult? If an inferior court was incapable in law of passing upon the constitutionality of the organic law, as well as legislative enactments, there would be no way to reach many such cases by superior courts."

But we have original jurisdiction of the case at bar, and we sit to try the case in the mode pointed out by the statute. In The People v. Sassovich, 29 Cal., 480, the court say, an act deliberately passed by the Legislature must be regarded by the courts as valid, unless it is clearly and manifestly repugnant to some provision of the Constitution. We unhesitatingly adopt this doctrine, and go farther, to say that, where the construction of an act admits of doubt, we would solve the doubt in favor of the legislative construction. In The Attorney-General v. The County of St. Clair, 11 Mich., 63, the court hold an act of the Legislature unconstitutional, because submitted to the people to be voted on. In Landb el al. v. Lynd et al., 44 Penn. S., 1, no other doctrine is laid down than we have already announced, that

in legislative bodies each house is to be the judge of the election and qualification of its own members. But no court has ever determined that to the legislative branch of the government belongs the duty or the right of construing and expounding the laws.

Since the submission of the cause our attention has been called to the matter of *Ex Parte* Harris, 47 Mo., 164. This is a very emphatic decision against the right of the Supreme Court of that State to decide upon the constitutionality of a law on a proceeding in *habeas corpus*. That court might have so decided in the absence of any statute; but certain it is that the decision is based upon a statute of that State, for we are told in the concluding paragraph of the opinion that the Legislature has placed a prohibition upon the court. But this is not the law of Texas, as we will proceed to show by a few extracts from opinions of this court already herein referred to.

In *Ex Parte* Coupland, 26 Texas, 391, which was a *habeas corpus* case, Judge Moore says: "The only question in the case for our consideration, and upon which the determination of the cause must turn, is as to the legality of the relator's detention as a soldier in the army of the Confederate States, and this depends entirely upon the question whether the act ' to further provide for the public defense,' commonly known as the conscript law, is constitutional. We address ourselves to the consideration of the question with a full appreciation of its magnitude and importance in respect both to public interest and private rights, the liberty of the citizen and the power of the government." This plainly defines the understanding and object of the learned court. Chief Justice Wheeler concurred in this opinion, and says, on page 431 : " It was my opinion that the law was constitutional, and it was upon this ground alone that I remanded him into the custody of the officer. This being

manifestly the only question proper to be decided or considered, I excluded all evidence," etc.

Justice Bell says, on page 407: "I am not able to concur in the judgment which has been rendered in this case, nor in the reasoning of the majority of the court in support of the constitutionality of the acts of the Congress of the Confederate States commonly called the 'conscript laws.' I believe those acts to be unconstitutional. The question is one of the greatest magnitude; it is directly presented for decision; and believing it to be fraught with the most vital concern to the principles of civil liberty and free government, I cannot forbear to express my opinion."

In *Ex Parte* Mayer, 27 Texas, 718, Reeves J., remarks: "On the legislative power two limitations are imposed. The first arises from the power of construction, and is vested in the courts and applied to written law of all kinds, when the law is ambiguous or contradictory; and secondly, the restrictions imposed by the Constitution, *and which the judiciary must enforce.* If the power is restricted, it must be exercised in subordination to the restriction. If it is without qualification of any kind, then the power of legislation is co-extensive with the grant.     \*     \*     \*     \*     \*     When the power of the judiciary is invoked to arrest the execution of a law for the reason that it conflicts with the Constitution, the courts must judge and decide for themselves; and their decision, if against the validity of a law, does not proceed so much on the ground that the lawmakers have transcended their authority—though that result may necessarily follow—as that the courts in exercising the authority vested in the judiciary as a separate branch of the government withhold their assent from the law, and thereby arrest and defeat its execution." This was a case on *habeas corpus*, and grave constitutional questions were brought under decision.

Having thus shown what we must regard as our duty in this case, we now come to the discussion of the point involved.   Section 6 of Article 3 of the Constitution of 1869 reads thus: "All elections for State, district and county officers shall be held at the county seats of the several counties, until otherwise provided by law; and the polls shall be opened for four days, from 8 o'clock A. M. until 4 o'clock P. M. of each day."

The 12th Section of the act of March 31, 1873, reads thus: "That all elections in this State shall be held for one day only at each election, and the polls shall be open on that day from 8 o'clock A. M. to 6 o'clock P. M."

The relator is charged, under the 31st Section of this act, with having voted more than once at the same election, which, if the election were valid, makes the offense a felony, punishable by imprisonment for not less than two nor for more than five years.

In Dickey v. Hurlburt, 5 Cal., 343, the court hold that time and place are of the substance of every election. This decision relates to a statute, and the provision was regarded as mandatory; but we are called on to construe a *constitutional* provision, and say whether an election, held in pursuance of an act which violates the Constitution, as to the time for holding an election, is a valid election or not; and whether, if the relator did vote twice at such election, he is guilty of the felony denounced in the law.

In construing Section 3 of Article 5 of the Constitution, in the matter of the International Railroad, where the text of the clause reads thus, "The Supreme Court and the judges thereof shall have power to issue the writ of *habeas corpus*, and, under such regulations as may be prescribed by law, may issue the writ of *mandamus* and such other writs as may be necessary to enforce its own jurisdiction," the different clauses here are separated by

a *semicolon;* and this court held, that while the Constitution gave us original jurisdiction in *habeas corpus*, the clause must be so construed that our jurisdiction in *mandamus* was only appellate, and must be regulated by law.

In Section 6 of Article 3 we think we have a still plainer case of the separation of two clauses, one of which is subject to a limitation or condition, whilst the other is not. The Legislature undoubtedly have the power to provide for holding the elections at places other than the county seats ; but it is equally clear that the Constitution is mandatory, and that the Legislature have no power to limit the time within which the elections must be held ; and Section 12 of the act of March 31, 1873, is in open conflict with the Constitution, and for that reason is null and void ; and no valid election having been held at the city of Houston, in the county of Harris, on the second day of December, 1873, the relator is not guilty of a felony, and is therefore entitled to his enlargement. But the importance of making plain the true construction of Section 6 of Article 3 of the Constitution demands some analysis of the section, and the application of well known canons of construction.

One principal object was in the mind of the convention when this section was framed and adopted, viz., the election. But two conditions were necessary to this object— place and time. It is very natural that the convention might deem it advisable to submit the regulation of one of these conditions to the Legislature and withhold the power over the other ; and thus the true sense of the section is this : the Legislature may by law provide the places where the elections shall be held, but the law governing the time given for the holding of an election shall never be changed by a Legislature. The plain import of the words and the grammatical analysis of the sentences admit of no other construction, and there is no such

doubt as would enable this court to follow the legislative construction.  But able counsel have thought that Section 33 of the 3d Article of the Constitution demands a different construction for Section 6.  The section reads thus:  "Elections for Senators and Representatives shall be general throughout the State, and shall be regulated by law."  Undoubtedly this section is in harmony with Section 6.  The regulation by law may be the statue law touching the places of holding elections, and the time given for holding them by the Constitution.  Section 4 of Article 3 of the Constitution reads thus:  "The members of the House of Representatives shall be chosen by the qualified electors, and their term of office shall be two years from the day of general election; and the sessions of the Legislature shall be annual at such times as shall be prescribed by law."  Here the words "general election" are followed by a *semicolon*, and so far the clause is mandatory; but the remaining clause of the section, except that it provides that the sessions of the Legislature shall be annual, leaves the Legislature free to fix the time of its own meetings and adjournments.  Here, then, in the same section, are different objects and conditions to those objects grouped together, but in different clauses.  But one only of these conditions, and that found in the concluding part of the section, is left to legislative control.  The members of the House of Representatives must be chosen by the qualified electors; their term of office is two years; the Legislature must meet annually; and over these conditions the Legislature has no control; but they have control of the time of their meeting and adjournments.

Now, let us look again at Section 6, and ask this question: if the convention had intended the words "until otherwise provided by law," to apply to both clauses of the section, why do not these words follow the second as

Opinion of the Court.

well as the first clause, or, why were they not inserted at the conclusion of the section where they could grammatically apply to both clauses? Neither will the rules of grammar nor of good composition admit of a proviso or condition, placed at the conclusion of an antecedent clause, applying to the subsequent clause of the sentence. In the case of Gibbons v. Ogden, 9 Wheat., Marshall, C. J., lays down the following as a rule of construction: "The framers of the Constitution, and the people who adopted it, must be understood to have employed words in their natural sense, and to have understood what they meant." The application of this rule is so obvious and clear that comment is unnecessary.

There are many provisions in statutes which are regarded by the courts as merely directory, and if substantially complied with, though not literally, it will be held good; but this is not the case where constitutional provisions are to be regarded; they are almost universally regarded as mandatory. (See Cooley's Con. Lim., 82, and authorities referred to.) But we have seen that even in a statute governing elections both time and place are of the substance and must be regarded as mandatory. (5 Cal., 343.)

RELATOR DISCHARGED.

NOTE.—To the historian, rather than the law reporter, belongs the duty of perpetuating the memory of the events connected with the installment of the State officers chosen at the general election pronounced illegal by this opinion. Those who are not familiar with what followed will find it faithfully detailed in a lengthy note to Paschal's Digest of the Laws of Texas. (Edition of 1874, Vol. 2, page 1393e *et seq.*) The note contains the dispatches between the President, Attorney-General of the United States, and ex-Governor Davis, in regard to the application made by the latter for military assistance to prevent Governor Coke from occupying the executive office.

We may properly say, that the question before the court in *Ex Parte* Rodriguez received its final practical solution as a *political* and not a judicial question.—REPORTERS.