EX PARTE A. H. JIMENEZ AND JUAN M. PUENTE.

No. A-6919. Decided October 22, 1958.
Rehearing overruled November 19, 1958.
(317 S.W. 2d Series 189)

Gordon Gibson, John E. Fitzgibbon, Jacob G. Hornberger, all of Laredo, Josh H. Groce, of San Antonio, for relators.

E. James Kazen, District Attorney, of Laredo, for respondent.

MR. JUSTICE GARWOOD delivered the opinion of the Court.

The relators, A. H. Jimenez, who is the Chief of Detectives of the City of Laredo police force, and Juan M. Puente, a detective on said force, seek relief by original *habeas corpus* in this Court, alleging that they are illegally restrained by the sheriff of Webb County. The restraint is due to an allegedly void contempt judgment of the acting judge of the 49th Judicial District Court. purportedly rendered pursuant to Art. 9.02 of the Texas Election Code (Vol. 9, Vernon's Texas Civ. Stats.) on account of the refusal of relators to testify in a Court of Enquiry held before said judge in said county under said statute.

The application followed an unsuccessful one made to the Court of Criminal Appeals, which released the relators on bail but later remanded them to custody on various grounds not here relevant. We also granted bail pending our final action on the writ (order to the shreiff to show cause), and there has now been held a full hearing upon briefs, oral argument, the record of the Court of Enquiry and sundry jurisdictional affidavits.

The proceeding has developed to be somewhat unusual. The District Attorney of Webb County, who initiated the Court of Enquiry, subpoenaed and sought to question the relators, moved the judge to commit them for contempt, and is the only party besides the relators to appear in the instant proceeding, has himself asserted in oral argument and briefs that the relators, if restrained at all when we issued the writ (which he seeks

to show by affidavits filed in this Court that they were not), were, indeed, unlawfully restrained at that time, and should be released, because the commitment order or *capias* of the District Clerk, issued pursuant to the contempt judgment, became *functus officio* after the relators were first "released" on bail by the Court of Criminal Appeals. In other words, he openly concedes that the relators should be released. On the other hand, counsel for the relators, while necessarily agreeing that relators should be released, yet appear to oppose their relase unless it be granted on one or more of the grounds advanced by themselves. The situation is somewhat reminiscent of the celebrated case of Ex Parte Rodriguez, 39 Texas 705.

Although a primary ground presented to the Court of Criminal Appeals was that the contempt judgment violated the privilege of relators against self incrimination (Art. I, Sec. 10, State Const.), that ground was not even urged upon the formal oral argument before this Supreme Court and, indeed, counsel for relators have in a "foreword" to one of their briefs intimated that the point is not well taken. Considering this, and the fact that, on the record, it is at least quite doubtful that relators claimed and, if claiming, did not waive, their privilege, we consider that this question is not in the case and will therefore not discuss it further. Relators have, however, at all times urged that Art. 9.02, supra, is unconstitutional and inoperative because of insufficiency of the caption of the bill enacting the Election Code and sundry other reasons; that the Court of Enquiry was in no event validly constituted, that (wholly aside from the matter of self incrimination) the general refusal of the relators to testify was inadequate as a basis for adjudging them to be in contempt, and that two separate statutes with conflicting penalty provisions purport to govern the situation of the relators, with the result that no penalty at all is provided for their alleged contempt.

The Attorney General of Texas has filed an *amicus curiae* brief upholding the validity of Art. 9.02, supra.

At the outset, the mere fact the District Attorney himself agrees that the relators should be released, does not, in our opinion, justify us in releasing them. In other words, the District Attorney has no more authority to concede away a judgment of contempt than he would have had to render one in the first place. Of course, if the reason for his consent were sound in law, we ourselves would release them; but we would do so

because of the reason rather than the consent, and we do not consider the reason to be sound.

The question about the *capias* or commitment order is not the same as that of whether the relators were under actual restraint at the time our show cause order issued. The fact that the document had become *functus officio*, if it had, does not mean that they were not under restraint in fact; and, as hereinafter explained, we think we must assume that they were. So assuming, we do not consider, and are cited to no authority requiring us to hold, that the restraint was illegal in the absence of a new *capias*. The release of the relators on bail by the Court of Criminal Appeals was a mere temporary or conditional release; and in such a situation no statutory or constitutional provision that we know of requires new formalities as prerequisite to valid restraint. The ultimate judgment of that court denying them relief adequately evidenced a judicial requirement that they be returned to custody; and it, together with the original *capias*, constituted sufficient formality for again restraining their liberty either by keeping them in confinement upon a voluntary surrender of their persons or forcibly seizing and confining them.

■ As to whether the relators were in actual custody when we issued our writ, a confusing mass of affidavits pro and con has been filed. However, it being beyond question that relators were adjudged to be in contempt, were originally taken into actual custody under a commitment issued pursuant to the judgment, and would normally have been taken back into custody following dismissal of their first *habeas corpus* proceeding, we conclude that we must honor their sworn statement and that of the sheriff to the effect that they were under actual restraint when our writ issued.

The contention that Art. 9.02 is invalid under Art. III, Sec. 35 of the State Constitution for deficiency of the caption of the corresponding act is without merit. The act was adopted in 1951 and self-styled in the enacting clause as "the Election Code of the State of Texas." See Gen. and Spec. Laws, 52nd Legis., Reg. Sess., 1951, Chap. 492; Vernon's, Vol. 9, supra. Its approximately 100 printed pages and 250 separate sections supplant nearly all of the complicated mass of statutes theretofore governing the election process and, like the bride's wedding raiment, almost necessarily include "something old, something new, something borrowed, something blue." In writing the caption, the authors pursued the sensible, if not the only possible, course,

making it brief and general rather than extensive and particularized. Even so, it is more elaborate than the caption of the similar and far larger enactment known as the Revised Civil Statutes of 1925, which read merely, "A Bill to be entitled 'An Act to Adopt and Establish the "REVISED CIVIL STATUTES of the State of Texas" '." The instant caption reads:

"An Act to adopt and establish an election code for the State of Texas, to revise and recodify Title 50 of the Revised Civil Statutes of 1925 of Texas, and all amendments thereto, to repeal all Acts in conflict herewith, provided, however, that nothing in this Act shall be construed as repealing or in any way affecting the legality of any penal provision of the existing law, and further provided that nothing in this Act shall in anywise alter, amend, or repeal House Bill No. 43, Acts Regular Session, Fifty-second Legislature; providing a saving clause; providing an appropriation; providing the effective date; and declaring an emergency."

The alleged deficiency in the foregoing is that, unlike the caption involved in our recent decision in Shannon v. Rogers, 159 Texas 29, 314 S.W. 2d 810, it makes no specific reference to the provision in question contained in the act itself, and that provision being nongermane to the general subject stated in the caption, the latter does not adequately inform the caption reader as to the contents of the act or bill.

The question is somewhat similar to that involved in Board of Water Engineers v. City of San Antonio, 155 Texas 111, 283 S.W. 2d 722, 725, in which we held that a general caption reference to "An Act amending Sections 1 and 2" of an existing law, while sufficient as to any provision in the amendatory act that could be considered germane to the subject matter of the old sections said to be amended, was inadequate in the particular case, because the provision of the amendatory act was not so germane. The sections of the original law dealt with the general subject of organization and corporate powers of water supply corporations, while the provision of the amendatory act held invalid prohibited the withdrawal of "any water from the Guadalupe River or Comal River * * * for the purpose of transporting such water to any point or points outside of the natural watersheds of such rivers." Actually, in such cases, the real question is often not whether the caption adequately refers to the provision of the act under attack, but whether the act itself, even with a perfect caption, does not violate the first require-

ment of the same constitutional section that "No bill * * * shall contain more than one subject."

■ But Art. 9.02, supra, does not violate either the latter provision nor the one requiring that the subject be "expressed in its title." Since the legislature undoubtedly has as much power to enact a code as it does a single law of narrowest scope, and since any sort of "code" necessarily involves many different kinds of individual provisions, none of these latter will violate the "one subject" restriction, if it has any logical relationship to the general subject. We consider it beyond dispute that there is such a relationship between the general subject of elctions and a particular provision (Art. 9.02) for a court of enquiry to expose fraudulent electoral practices. The latter is merely one of the many different means stipulated in the code to insure a more pure and orderly conduct of elections.

This same consideration applies also to the requirement that the subject of the act or bill be "expressed in its title (caption)." The captional words, "to adopt and establish an election code," are clearly broad enough to include the subject matter of Art. 9.02, and are not limited by the succeeding words, "to revise and recodify Title 50." Indeed, the latter phrase itself is probably broad enough to put any reasonable caption reader on notice that he will find new matter in the body of the bill. The caption in the Board of Water Engineers case, supra, was far narrower, and accordingly the logical connection between it and the questioned provision of the act much more remote, than is the case here. Nor, unlike the case of Texas-Louisiana Power Co. v. City of Farmersville, Texas Comm. App., 67 S.W. 2d 235, is there anything in the caption to mislead the reader by affirmatively suggesting that the act does not contain a provision such as Art. 9.02. While no cases are cited to us involving broad enactments, with correspondingly short and general captions, like the present, the principles of decisions like Doeppenschmidt v. International & G. N. R. Co., 100 Texas 532, 101 S.W. 1080, and Central Education Agency v. Independent School District of El Paso, 152 Texas 56, 254 S.W. 2d 357, a fortiori sustain our conclusion.

■ We also reject the contention that Art. 9.02 violates that part of our constitutional guarantee of free speech (Art. I, Sec. 8) stating that the speaker or writer shall be "responsible for the abuse of that privilege," in that a witness in the court of enquiry will necessarily have an absolute privilege against civil and criminal liability for otherwise slanderous statements he

may make about third persons. No decisions appear to have ever applied this particular language of the Constitution, but conceding it to infer some limitation on the legislative power to expand the privilege against responsibility for erstwhile slander or libel, we cannot imagine it to have been intended to be also a general restraint on the legislative power to provide for investigations or create investigative bodies. It might equally well be argued to limit legislative power to create any new kind of court (such as one of domestic relations).

Equally unsustained is the argument that Art. 9.02 violates (a) the due process clause of the State Constitution (Art. I, Sec. 19) and accordingly also the due process provision of the 14th Amendment to the Federal Constitution and (b) those provisions of Art. I, Sec. 10, supra, of the State Constitution relative to the conduct of criminal prosecutions (other than the privilege against self-incrimination, which Art. 9.02 obviously does not purport to restrict). No cases are cited except the famous decision in Marbury v. Madison, 1 Cranch 137, 2 L. Ed. 60, and this evidently for the nowadays elemental proposition that courts have the power to adjudge legislative acts to be invalid when in conflict with applicable constitutions.

■ Whatever serious due process defects in Art. 9.02 may in some future case be pointed out to us, certainly none such are now suggested by the relators or occur to us independently, while the Attorney General of Texas, who would seem to have no particular reason for partisanship on either side of the question, strongly asserts the article to be valid. There is nothing more essentially arbitrary or oppressive about a court of enquiry conducted before a district judge than there is about various other kinds of investigations and investigative bodies, authorized by this state, with provision for compulsory attendance of witnesses and punishment for contempt for refusal to testify. It is no objection from the due process standpoint that the enquiry is not stated to have any immediate object beyond ascertainment of what witnesses may swear to be the facts and making a record thereof. That, unlike a grand jury investigation, it is publicly conducted, does not necessarily make it invalid. The concept of due process being the rather intangible one that it is, we must, in applying it to situations like the present, have some regard for the fact that the state legislature is the repository of all lawmaking power of the people not clearly denied to it by the State or Federal Constitutions, and that, if it may not from time to time experiment with new devices for the improvement of government, there is little chance for such

improvement except by the painfully slow method of periodical amendment and revision of the Constitution.

As to Sec. 10 of Art. I, supra, Art. 9.02 does not purport to be a prosecution for crimes either without or with the safe-guards which Sec. 10 provides. Relators themselves argue (as a due process defect) that the Court of Enquiry is largely "pur-poseless." The power of the judge to punish a witness for re-fusal to testify does not convert the otherwise "purposeless" proceeding into a criminal prosecution against the witness nor anyone else; and, obviously, if there were any occasion for the recalcitrant witness to cross-examine other witnesses in the matter of determining whether the former was or was not ac-tually in contempt, there is nothing in Art. 9.02 to prevent it. The fact that this or that individual (whether himself a witness or not) may be accused of a crime by another witness without having the opportunity to cross-examine that witness does not transgress Sec. 10, supra. Even a person who is a prospective subject of indictment of a grand jury does not have the right of cross-examination of the accusing witnesses in the grand jury proceeding; and if witness X in a criminal trial of A ac-cuses B of committing the crime, certainly the proceeding is not voided by the fact that B, who was not on trial, had no oppor-tunity to cross-examine witness X. Why should the rule be any different in the instant proceeding?

And conceding some artlessness in the draftsmanship of Art. 9.02, we also reject the point that it is so vague and con-fusing as to be void. The reference in one provision to the "court," while another uses the word "judge," does not make it so; nor does the fact that the proceeding is described as "ex parte" and at the same time said to "be conducted in the usual manner as a Court of Enquiry." Obviously it is *ex parte,* since there are no formal parties; but there is no logical conflict in the idea of a proceeding without formal parties being conducted in the manner of a Court of Enquiry.

The particular provision of Art. 9.02 describing the conduct of the proceeding as that of a Court of Enquiry goes on to state:

"* * * and the court shall issue such processes for witnesses and records relevant to the conduct of such election as may be requested by the appropriate attorney for the State, and dis-regard of subpoenas or other processes or refusal to testify at such hearing shall be punished by the court *as in civil cases.*" (Emphasis supplied.)

It is argued that, since the only "Court of Enquiry" to which Art. 9.02 could have had reference for the manner of procedure is that provided by Arts. 886-887, Vernon's Texas C. Crim. Proc., to be held by a Justice of the Peace, and since said Art. 887 provides, in respect of contempt, a confinement penalty for refusal to testify "until they make such statement," conflicting contempt penalty provisions result, because the further words "as in civil cases" above quoted must refer to Art. 1911, Vernon's Texas Civ. Stats., empowering district courts to punish "by imprisonment not exceeding three days." This is said to be the same situation as that wherein two otherwise largely identical criminal statutes are held void because they provide different penalties. Ex Parte Sanford, 163 Texas Crim. Rep. 160 289 S.W. 2d 776, and cases cited.

We do not agree with this somewhat legalistic analysis of the quoted provision. The natural interpretation, and one which due deference to the legislature might well justify in any event, is that the form of the proceeding shall be, in general, that of a Court of Enquiry, but that, as regards the particular matter of contempt, the judge shall have the same powers as in an ordinary civil suit.

The claim that the entire proceeding was void as improperly constituted rests on the undoubtedly true assertions that: the application of the District Attorney initiating it and the order of the District Judge convening it, fail to designate what election and what violations of election laws are being investigated. Conceding that the application was overly broad and vague to constitute the best procedure in a matter of this sort, and that the judge might properly have required the District Attorney to make more specific allegations than the mere statement that his purpose was "enquiring into violation of the election laws in Webb County," nevertheless, Art. 9.02 itself does not clearly require any different procedure, and its broad and general terms do not restrict the subject matter to any particular election or kind of violation of the election laws. Considering the relatively innocuous nature of the proceeding, which bears little resemblance to a trial or even an indictment, and attributing, as we should, some favorable significance to the fact that it has to be brought by the chief law enforcement officer of the area and allowed by formal order of a district judge, we do not think it should be held void, even if the statute clearly contemplated a much more specific statement in the application and order. Admittedly the point is backed by no decisional authority. It is overruled.

Finally it is argued that where a witness simply refuses to say anything, and the matter stops there, he may not be judged in contempt, because he may legally be so adjudged only for refusing to answer a "proper question," which means a question about a specific fact or rather than; for example, "Are you going to answer the questions about to be propounded or are you not?"

■ While the argument is apparently not dependent upon the matter of self incrimination, it is sought to be tied in with the undoubted fact that the only action of the District Attorney touching the testimony expected from the relators was his warning that they were suspected of election offenses, and that their testimony would be used against them, followed by the query, "Do you want to make a statement?" To this question the relators forthwith replied by saying they refused to testify; and the rest of the questions, answers and statements of counsel dealt merely with their reasons for not testifying.

Now the contention is not, and on the record could not well be, that the relators were thus misled by the District Attorney into thinking that they were free not to testify even though they should not have or claim a legal excuse. The statement and question obviously referred to their privilege against self incrimination, and that only; and the rest of the proceedings show that relators, their counsel and the judge all understood that relators were being *asked*, although in general fashion, to testify concerning the subject of illegal election practices, in which they were said to have participated, and were refusing to testify on the grounds stated by their counsel.

This idea of requiring a specific question in a situation like the present seems to stem from Art. 387, Vernon's Texas C.C.P., providing that:

"When a witness, brought in any manner before a grand jury, refuses to testify, such fact shall be made known to the attorney representing the State or to the court; and the court may compel the witness to answer *the question, if it appear to be a proper one,* by imposing a fine not exceeding one hundred dollars, and by committing the party to jail until he is willing to testify." (Emphasis supplied.)

But the statute simply assumes the usual situation, that is, one in which a question about some specific matter is actually asked, and the witness declines to answer it. Its terms do not

purport to require the interrogator, when the witness declines from the outset to testify, to go through the idle rigmarole of putting specific questions. The Texas decisions, cited for relators, admittedly do not so hold; nor do they infer that such should be the rule. For example, in Ex Parte Jennings, 91 Texas Cr. Rep. 612, 240 S.W. 942, 22 A.L.R. 1351, there actually was at least one specific question asked by the grand jury,—as to the relator's membership in the Ku Klux Klan. His commitment for refusing to answer was voided on original *habeas corpus*, because the question admittedly had no relationship to the investigation of crime, which was the only authorized subject of enquiry by the grand jury. Thus the statement by the appellate court that, "* * * before a witnes who refuses to answer * * * can be punished for contempt, it must affirmatively appear, in the language of the article just quoted, that the question be 'a proper one,' " had reference only to the "proper" relationship between the information sought and an authorized subject of enquiry, and not to the form of the interrogation procedure. Obviously, if the witness simply refuses to open his mouth, he has refused to answer all "proper" questions, as well as others. If he assumes that all-inclusive attitude, particularly in a proceeding before a judge, it seems to us an extraordinarily formalistic indulgence to him that the interrogator must yet proceed to interrogate him specifically, as if making a sort of bill of exception consisting of questions but no answers.

Admittedly the only case in point is a three-opinion (one dissenting) decision by a three-judge intermediate appellate court of Missouri, to wit, Ex Parte Green, 126 Mo. App. 309, 103 S.W. 503, 505. It was a case of commitment of a witness by a notary public for a general refusal to give deposition testimony in an ordinary civil suit, the refusal being based entirely on advice of counsel that, at the time of the refusal, the depositions had already been "closed." In releasing the witness on *habeas corpus*, the two opinions favoring the release relied first on grounds entirely unrelated to that for which the case is here cited and, as to the latter ground, differed in the reasoning. The first opinion reasoned that, "His declaration that he would not answer any question was nothing more than an expression of a declared purpose to commit a criminal contempt, rather than submit to a further examination as a witness before the commissioner. * * * Communicated intent to commit a crime is not a crime." The corresponding reasoning of the second opinion was that the witness should have a chance to change his mind, and that a contrary holding might sometimes lead to a witness being committed when he actually had a privilege against self crim-

ination as to all or part of the subject matter involved. Each of these reasons obviously reflects the view of but a single judge, and we do not find them to be singly or collectively persuasive. A "blanket" refusal to answer is no less nor more of an act of contempt than a refusal to answer a question about a specific matter.

Finding persuasive none of the reasons given originally or now for declaring the contempt commitment of the relators to be void and their restraint to be accordingly unlawful, the relators are hereby remanded to custody.

Opinion delivered October 22, 1958.

MR. JUSTICE SMITH joined by JUSTICE GRIFFIN, dissenting.

I respectfully dissent. The trial court's judgment of contempt purportedly rendered pursuant to Article 9.02 of the Texas Election Code, Volume 9, Vernon's Texas Civil Statutes, is absolutely void. A reading of the warning given each witness, Jimenez and Puente, should be sufficient to satisfy any court that the witnesses were not in contempt of court in declining to testify. The majority relies very strongly on the action of the attorneys for the Relators in assigning as a reason for the refusal that Article 9.02, supra, was unconstitutional. The majority construes such reason to be the only reason assigned, and that such reason could be valid only in the event the Act should be held to be unconstitutional as contended by the attorneys for the Relators. Under my view of this case, we do not reach the constitutional question.

This Court should not permit itself to be in a position of rendering an advisory opinion on the constitutionality of the Act involved. A holding on its constitutionality should only be made where it is necessary to a decision of the law question involved. See San Antonio General Drivers & Helpers Local No. 657 et al v. W. L. (Jack) Thornton, 156 Texas 641, 299 S.W. 2d 911.

My purpose shall be to show the real reason why the Relators failed to testify and why they are not guilty of contempt. At the same time, it shall be my hope that the majority will become convinced that the legal reason which prompted the District Attorney to suggest in oral argument a dismissal of the proceedings was that in view of the warning given there was no lawful basis for contempt charges against either of the Relators.

Mr. Jimenez, Chief of the City Detectives, after being sworn, was warned by the District Attorney:

"Q. It is my duty to warn you that certain charges have been made here before the Court of Inquiry that may incriminate you, and that if charges are preferred against you, that you will be prosecuted. The law does not compel you to make any statement whatsoever, but if you would like to you may make any voluntary statement you desire to, but any statement that you make can be used in evidence when you are tried on these charges. Do you want to make a statement?

"A. I refuse to testify; I have to consult to my attorney.

"Q. Just a second—

"A. Your Honor, I refuse to testify, but I want to talk to my attorney."

Mr. Puente, a City Detective, was given the following warning:

"Q. It is my duty to warn you that certain evidence has been adduced at this Court of Inquiry that tends to incriminate you, and that you have a Constitutional privilege not to testify on the ground that anything that you might say may incriminate you. Do you want to testify before this Court of Inquiry?

"A. I decline to answer under the Provision of the Bill of Rights until I confer with my lawyer."

The record clearly reflects that before either of these Relators were called as witnesses, in fact, in the very beginning of the Court of Inquiry, the attorneys raised the question of the constitutionality of Article 9.02, supra, and in that connection made the following preliminary statement:

"MR. HORNBERGER: I believe you wanted me to address the Court * * * it is my understanding, Your Honor, that Mr. Hall, and Mr. Fitzgibbon, and myself are being permitted to present to the Court two point, and two points only at this time in view of the fact that at this particular time *we have no official standing in this hearing.*" Then the attorney stated that the two points were, first, the constitutionality of Article 9.02 of the Texas Election Code, and (2) the duplication of effort in-

asmuch as the evidence would necessarily be presented to a Grand Jury which would convene the following Monday.

My position is simply that attorneys who have no purpose other than the two mentioned, or, for that matter, regardless of their motives, cannot waive the rights of the Relators. Each of these Relators gave a sufficient reason for refusing to make a statement, or, as stated by both of them, for refusing to testify. In view of the warning regardless of whether it was the duty of the District Attorney to give one, the witnesses were given a choice to make a statement or not. They chose not to make one. How can they be held in contempt? The witnesses were told in one breath that the law does not compel a statement, and in the next they would be sent to jail if they refused.

Permit me to point out that the order of June 11, 1958, holding both Relators in contempt, is not in keeping with what actually transpired. The order does not reflect that when the Relators were brought before the Court of Inquiry they were each given the warning herein set out. It merely says that the Relators were subpoenaed as witnesses and brought before "this Court of Special Inquiry" and having been sworn, etc., refused to testify * * *."

The witnesses after the warning said they refused to testify. In the case of Quinn v. United States, 349 U.S. 155, 75 Sup. Ct. 668, 99 L. Ed. 964, 51 A.L.R. 2d 1157, it was said: "The privilege against self-incrimination is a right that was hard-earned by our forefathers. The reasons for its inclusion in the Constitution * * * are to be found in the lessons of history * * *." The court went on to say that no ritualistic formula is necessary in order to invoke the privilege. In our case the Relators perhaps did not use the precise language that others have been known to use in claiming the privilege, yet, when they answered that the refusal was because of "my civil rights," it seems to me that the court should have proceeded no further in the examination of these witnesses. These Relators were under no duty to assign any reason for refusal in view of the form of the warning. The answers of each of the Relators to the warning were sufficient regardless of the subsequent statements of the attorneys. The warning given makes no hint of a promise of immunity to the Relators. It was obvious to both Relators that an attempt through the Court of Inquiry was being made to secure information from the Relators upon which criminal charges against each of them could be based.

Under such circumstances no man should be deprived of his liberty for one moment. The mere fact that some of the attorneys wanted the constitutional question determined and, therefore, added the reason that the Act was unconstitutional does not alter the rights of these Relators. They were acting within their legal right when they refused to testify. Without aid from their attorneys they invoked their constitutional privilege against self-incrimination.

I would discharge each of the Relators. The District Attorney is of the same view. The fact that he reached such decision through reasoning conceived to be erroneous by the majority becomes immaterial. The fact remains that there was a good and sufficient reason for the dismissal of the charges.

Opinion delivered October 22, 1958.

Rehearing overruled November 19, 1958.

Note: Writ of certiorari to Supreme Court of United States denied April 20, 1959. 359 U.S. 968, 79 Sup. Ct. 881, 3 L. Ed. 2d 836.